## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| MICHAEL GRIBE, derivatively on behalf of VESTIS CORPORATION, | |
| Plaintiff, | |
| vs. | |
| KIMBERLY SCOTT, RICK DILLON, PHILLIP HOLLOMAN, RICHARD BURKE, TRACY JOKINEN, LYNN MCKEE, DOUG PERTZ, MARY ANNE WHITNEY, and ENA WILLIAMS, | Case No. |
| Defendants, | |
| and | **DEMAND FOR JURY TRIAL** |
| VESTIS CORPORATION, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Michael Gribe ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Vestis Corporation ("Vestis" or the "Company"), files this Verified Shareholder Derivative Complaint against Kimberly Scott ("Scott"), Rick Dillon ("Dillon"), Phillip Holloman ("Holloman"), Richard Burke ("Burke"), Tracy Jokinen ("Jokinen"), Lynn McKee ("McKee"), Doug Pertz ("Pertz"), Mary Anne Whitney ("Whitney"), and Ena Williams

("Williams") (collectively, the "Individual Defendants," and together with Vestis, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Vestis, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution against Defendants Scott and Dillon under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Vestis, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Vestis's directors and officers from October 2, 2023 to May 1, 2024, both dates inclusive (the "Relevant Period").

2.      Vestis, headquartered in Roswell, Georgia, is the product of a September 2023 separation by Aramark, a global provider of food and facilities services, of its Aramark Uniform Services ("AUS") segment into an independent public company (the "Spinoff"). Before the spinoff, the Aramark segment that would later become Vestis, AUS, provided rental uniforms and workplace supplies and services such as delivering uniforms, laundering rental linens, providing floor mats and towels; providing restroom services; and providing first-aid supplies, among other things. Vestis provides those same services and products today.

3.      On October 2, 2023, Vestis's common stock began trading on the New York Stock Exchange (the "NYSE") under the symbol "VSTS." The Company is now "a leading provider of uniform rentals and workplace supplies across the United States and Canada" to more than 300,000 locations. Vestis's clients span several industries, including manufacturing, hospitality, retail, pharmaceuticals, and healthcare.

4.      Before the Relevant Period and before Vestis was trading on the NYSE, on September 13, 2023, Vestis executives held an inaugural "Vestis Analyst Day" call. During the analyst day call, Defendant Scott, Vestis's incoming Chief Executive Officer ("CEO"), represented that she had "joined Aramark Uniform Services a couple of years ago with the intent of preparing the business for this exact moment." Defendant Scott characterized Vestis as a growth business,

stating that there would be "5% to 7% top line growth on" compound annual growth rate ("CAGR").

5.      Also, during the analyst day call, certain of the Individual Defendants specified three areas of Vestis that would drive growth: (1) new high-quality customers; (2) retention of already existing customers; and (3) the ability to raise prices. Regarding the "pricing" component, the Individual Defendants maintained that "the 5% to 7% is not a pricing play [but still] we're acknowledging that we will take price." Defendant Dillion, the incoming Chief Financial Officer ("CFO") flatly maintained, "we've also demonstrated our ability to take price."

6.      Indeed, the Individual Defendants used the analyst day call, to depict Vestis in an extraordinarily bullish fashion, boasting that the Company possessed data analytics with a focus on its customer base and a sales team capable of cross selling the existing customer base while also simultaneously identifying and developing new customers. For instance, Defendant Scott asserted that "investments are in place, they've been made, they're in our run rate."

7.      After the analyst day call and during the Relevant Period, the Individual Defendants caused Vestis to represent to the investing public that the Company has "service excellence culture" and focuses on "amazing customer experience" while also receiving "really, really great feedback" from the Company's customer service initiatives.

8.    On February 7, 2024, Vestis filed a current report on Form 8-K with the SEC. The Form 8-K reported that the Company "continues to expect to deliver revenue growth in the range of 4.0 to 4.5% through our focus on providing service excellence to our customers and delivering high-quality growth" and that it "continue[s] to expect our adjusted [earnings before interest, taxes, depreciation, and amortization ("EBITDA")] margin to be approximately 14.3%." Vestis held an earnings conference call later that same day, during which Defendant Scott stated, ""[W]e expect acceleration in our growth rates that will follow similar patterns from prior years," and "we are also seeing opportunity for additional pricing actions in the back half of the year."

9.    However, behind the rosy picture the Individual Defendants publicly painted, Vestis suffered from outdated facilities and an underperforming sales force because Aramark had chronically underinvested in the AUS segment—for several years—before executing the Spinoff. Consequently, Vestis experienced "service gaps" before and after the Spinoff that prevented the Company from executing the impressive growth plan the Individual Defendants had so publicly emphasized.

10.    On May 2, 2022, the truth emerged when Vestis issued a press release that reported the Company's financial performance for the second quarter of the 2024 fiscal year. The press release contained a statement from Defendant Scott

which revealed that "Our results in the quarter and our outlook for the year are not in line with expectations." The press release featured a scaled back "Revised Fiscal Year 2024 Outlook," which revealed that Vestis "now expect[ed] to deliver fiscal 2024 revenue growth in the range of [negative] (1)% to 0%." On a earnings conference call held that same day, Defendant Scott detailed the "challenges" facing the Company "related to sales productivity and deliberate moderated pricing actions[,]" and that Vestis "also made the recent and deliberate decision to moderate pricing actions in the second quarter and the back half of the fiscal year in order to realize improved retention while we enhance our services processes." Defendant Scott further stated that the pricing decision, "is negatively impacting our revenue and EBITDA in the second half of the year." Regarding "service gaps," Defendant Scott revealed that "we know that more than 70% of the [customer] cancellations are due to causes that are within our control."

11.    On this news, the price per share of Vestis stock fell $8.31, or 45%, from closing at a price of $18.47 per share on May 1, 2024, to close at a price of $10.16 per share on May 2, 2024.

12.    Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about Vestis's business, operations, and prospects. In particular, the Individual Defendants failed to disclose to shareholders and investors that: (1)

Aramark had chronically underinvested in the AUS segment before the Spinoff; (2) due to the foregoing, Vestis suffered from outdated facilities and an underperforming sales force; (3) as a further result of foregoing, Vestis experienced "service gaps" before and after the Spinoff that prevented the Company from executing the impressive growth plan the Individual Defendants had so publicly emphasized; and (4) the Company failed to maintain internal controls. In light of the above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

13. In light of the Individual Defendants' misconduct—which has subjected the Company and various of its current officers and directors to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of Georgia (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the

Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.    Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, Vestis is headquartered in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

19.    Plaintiff is a current shareholder of Vestis. Plaintiff has continuously held shares of Vestis common stock at all relevant times.

### Nominal Defendant Vestis

20.    Vestis is a Delaware corporation with principal executive offices at 500 Colonial Center Parkway, Suite 140, Roswell, Georgia. Vestis common stock trades on the NYSE under the ticker symbol "VSTS."

### Defendant Scott

21.    Defendant Scott has served as Vestis's CEO and as a Company director from the Spinoff until March 2025. Previously, she served as President and CEO of Aramark's AUS segment from October 2021 until the Spinoff.

22.    The proxy statement filed with the SEC on December 21, 2024 (the "2024 Proxy Statement") stated the following about Defendant Scott:

Ms. Scott serves as the President and Chief Executive Officer of Vestis. She joined Aramark in October 2021 to serve as President and Chief Executive Officer of Aramark Uniform Services and to prepare Vestis to be a standalone, independent public company. Previously, Ms. Scott served as Chief Operating Officer of Terminix Global Holdings, Inc. (NYSE: TMX) from January 2021 to September 2021, overseeing operations for both the residential and commercial businesses, after having served as President of Terminix Residential from December 2019 to January 2021. Prior to Terminix, she served as President of Rubicon Global from July 2018 to September 2019, a role that followed an 11-year career at Brambles Limited, which culminated in Ms. Scott serving as President, CHEP North America for four years. Early in her career, Ms. Scott gained industrial manufacturing experience at the General Electric Company (NYSE: GE) and U.S. Steel (NYSE: X). She serves as a member of the board of directors for Greif, Inc. (NYSE: GEF).

### **Defendant Dillon**

23.    Defendant Dillon has served as Vestis's Executive Vice Presiden and

CFO from the Spinoff until January 2025. Previously, he served as CFO of

Aramark's AUS segment from May 2022 until the Spinoff.

24.    The 2024 Proxy Statement stated the following about Defendant

Dillon:

Rick Dillon, 53, serves as an Executive Vice President and the Chief Financial Officer of Vestis. Mr. Dillon joined Aramark in May 2022 to serve as Chief Financial Officer of Aramark Uniform Services and to prepare Vestis to be a standalone, independent public company. Prior to joining Aramark, Mr. Dillon served as Executive Vice President and Chief Financial Officer of Enerpac Tool Group (NYSE: EPAC) from December 2016 to April 2022. In addition to his experience at Enerpac, Mr. Dillon served as Executive Vice President and Chief Financial Officer at Century Aluminum (NASDAQ: CENX) for approximately three years. Prior to that, he held progressive leadership roles at publicly traded companies in finance

and accounting, including Joy Global, Newell Brands, and Briggs and Stratton, and in public accounting. He also serves as a member of the board of directors of Adient plc (NYSE: ADNT).

**Defendant Holloman**

25.    Defendant Holloman has served as a Company director and as the Chairman of the Board since the Spinoff. Defendant Holloman was appointed to serve as interim Executive Chairman, President and Chief Executive Officer, effective March 18, 2025. Defendant Holloman also serves as a member of the Board's Nominating, Governance, and Corporate Responsibility Committee.

26.    The 2024 Proxy Statement stated the following about Defendant Holloman:

> Mr. Holloman retired from Cintas as president and chief operating officer in 2018. Other roles during his 22-year career with Cintas included rental division president and chief operating officer, senior vice president of global supply chain management, executive champion of Six Sigma Initiatives, vice president of distribution/production planning and vice president of engineering and construction. Mr. Holloman is a founding member of Cintas' diversity committee and received the Excalibur Award, the company's highest distinction reserved for business executives who demonstrate excellence during their tenure. He serves as a member of the board of directors for Pulte Group (NYSE: PHM) and the BlackRock Fixed Income Board and was previously a member of the board of directors for Rockwell Automation (NYSE: ROK). In addition, Mr. Holloman serves on the board of trustees for the University of Cincinnati.

**Defendant Burke**

27.    Defendant Burke has served as a Company director since the Spinoff. Defendant Burke also serves as the Chair of the Board's Nominating, Governance,

and Corporate Responsibility Committee and as a member of the Audit Committee.

28.    The 2024 Proxy Statement stated the following about Defendant Burke:

> Mr. Burke previously served as chairman of the board and chief executive officer of Advanced Disposal Services, Inc. (NYSE: ADSW), an integrated environmental services company, from 2012 to 2020. Prior to that role, he served as president and chief executive officer of Veolia Environmental Services North America Corp., a solid waste and hazardous waste management company, from 2009 to 2012, and as president of Veolia ES Solid Waste, from 2007 to 2009. Mr. Burke currently serves on the board of U.S. Infrastructure Company, an underground utility locating business owned by Partners Group, and Biffa, a U.K. waste and recycling business owned by Energy Capital

**Defendant Jokinen**

29.    Defendant Jokinen has served as a Company director since the Spinoff. Defendant Jokinen also serves as the Chair of the Board's Audit Committee and as a member of the Compensation and Human Resources Committee.

30.    The 2024 Proxy Statement stated the following about Defendant Jokinen:

> Ms. Jokinen has over 30 years of finance and accounting experience across various global industries, where she focused on accelerating profitable growth and business transformation in her role as chief financial officer for both public and private companies. Most recently, Ms. Jokinen was executive vice president and chief financial officer of Vyaire Medical, a medical device company, from March 2020 to

January 2022. She previously held the role of executive vice president and chief financial officer at Acelity, from June 2017 until it was acquired by 3M (NYSE: MMM) in October 2019. She also served as chief financial officer of G&K Services, a publicly traded uniform services company, from 2014 until it was acquired by Cintas (NDAQ: CINTAS) in 2017. Ms. Jokinen currently sits on the board of directors at Alamo Group (NYSE: ALG), Array Technologies (NDAQ: ARRY), and Candela Corporation.

**Defendant McKee**

31.    Defendant McKee has served as a Company director since the Spinoff. Previously, Defendant McKee served as executive vice president and chief human resources officer for Aramark from 2004 until 2022.

32.    The 2024 Proxy Statement stated the following about Defendant McKee:

> Ms. McKee most recently served as executive vice president and chief human resources officer for Aramark from 2004 to 2022. Prior to this role, Ms. McKee held several key positions for Aramark from 1980 to 2004, including director of employee relations, vice president for corporate human resources, where she was responsible for executive development and compensation, and senior vice president for human resources of Aramark Global Food, Hospitality and Facility Services. In addition, Ms. McKee led Aramark's corporate communications, diversity, equity and inclusion, sustainability, community relations, corporate real estate and air and meeting services. Ms. McKee is currently a member of the board of directors of WSFS Financial Corporation (NASDAQ: WSFS) and Highmark Health, Inc.

**Defendant Pertz**

33.    Defendant Pertz has served as a Company director and as the Vice Chairman of the Board since the Spinoff. Defendant Pertz also serves as the Chair

of the Board's Compensation and Human Resources Committee and as a member of the Audit Committee.

34.    The 2024 Proxy Statement stated the following about Defendant Pertz:

> Mr. Pertz previously served as the executive chairman of the board of The Brink's Company (NYSE: BCO), a global leader in total cash management and secure logistics, until his retirement in May 2023. Mr. Pertz also served as the president, chief executive officer and a member of the board of The Brink's Company from June 2016 to May 2022. Prior to Brink's, he served as president and chief executive officer of Recall Holdings, having led Recall from its initial public offering in 2013 to the strategic sale of the business in 2016. He previously also served as chief executive officer of several other public companies, including IMC Global (predecessor to Mosaic Co. (NYSE: MOS)) and Culligan Water Technologies. Mr. Pertz currently serves on the board of directors for Advance Auto Parts (NYSE: AAP) and Vital Records Control.

**Defendant Whitney**

35.    Defendant Whitney has served as a Company director since the Spinoff. Defendant Whitney also serves as a member of the Audit Committee.

36.    The 2024 Proxy Statement stated the following about Defendant Whitney:

> Ms. Whitney has served as executive vice president and chief financial officer of Waste Connections (NYSE: WCN) since February 2021 and has more than 25 years of deep financial expertise. During her 17-year tenure at Waste Connections, Ms. Whitney has held executive-level finance roles, each with increased responsibilities, including senior vice president and chief financial officer from July 2018 to February 2021, senior vice president of finance, vice president

of finance and director of finance. Previously, Ms. Whitney held various finance positions at Wheelabrator Technologies.

**Defendant Williams**

37.    Defendant Williams has served as a Company director since the Spinoff. Defendant Williams also serves as a member of the Compensation and Human Resources Committee and the Nominating, Governance, and Corporate Responsibility Committee.

38.    The 2024 Proxy Statement stated the following about Defendant Williams:

> Ms. Williams has served as chief operating officer of Casey's General Stores (NASDAQ: CASY), one of the leading convenience store chains in the United States, since June 2020. She is responsible for store operations, supply chain, fuel operations, real estate, procurement and construction and maintenance. Prior to this role, Ms. Williams served as the chief executive officer and member of the board of directors of National HME, a technology enabled medical equipment provider, from January 2019 to March 2020. Ms. Williams also served as senior vice president and head of international operations for 7-Eleven, where she led the global growth strategy and had profit and loss responsibilities. Ms. Williams also held several positions in operations, retail, finance and planning for Mobil Oil Corporation and ExxonMobil Corporation (NYSE: XOM). Ms. Williams currently serves on the board of advisors for the Robert B. Rowling Center for Business Law and Leadership, at the SMU Dedman School of Law. She also serves on the board of directors for Children International and on the Dallas leadership committee for St. Jude.

**Relevant Non-Parties**

39.     The Securities Class Action captioned *Plumbers, Pipefitters and Apprentices Local No. 112 Pension Fund v. Vestis Corporation et al*, No. 1:24CV02175, in the United States District Court for the Northern District of Georgia Atlanta Division incorporates statements from former employees of Vestis who offered their experiences as confidential witnesses.[1] The following are former employees whose statements are references throughout this complaint before this Court.

*FE1*

40.     FE1 worked for Vestis between August 2022 and May 2023. During this time FE1 served as a consultant for the President of AUS. In his role, FE1 had access to certain customer retention reports.

*FE3*

41.     FE3 worked for AUS and Vestis between October 2004 and April 2024. During this time FE3 served as a National Sales Trainer and Compliance Manager.

---

[1] As was done with the Securities Class Action, all former employees are referred to as gender neutral to preserve their anonymity.

*FE4*

42.    FE4[2] worked for Vestis between February 2023 and March 2024. From February 2023 until October 2023 FE4 was an Account Executive for Vestis in Wixom, Michigan. From October 2023 until March 2024 FE4 was an Account Executive for Vestis in Toledo Ohio.

*FE5*

43.    FE5 worked for Vestis between November 220 and April 2024. During this time, he worked as a Regional Account Executive for Aramark and then Vestis in Nashville, Tennessee and Batan Rouge, Louisianna.

*FE8*

44.    FE8 worked for Vestis between December 2019 and April 2024. During this time, he worked as a Sales Account Executive in Nashville, Tennessee

*FE10*

45.    FE10 worked for Vestis from August 2018 until July 2022. During this time FE10 was a Regional Sales VP at AUS.

46.    In his role as Regional Sales VP, FE10 was responsible for sales strategy, go-to-market strategy and overseeing representatives and managers throughout his region.

---

[2] FE4 reported to Thomas Mueller, a Sales Manager for the Company.

*FE12*

47.    FE12 worked for Vestis between November 2020 and January 2024. During this time, FE12 worked as a Regional Account Executive in the Dallas/Fort Worth region of Texas.

48.    In his role as Regional Account Executive, FE12 was responsible for selling supplies, uniforms, and first aid items to small and medium-sized businesses.

*FE16*

49.    FE16 worked for Vestis between September 2022 and July 2024. During this time, FE16 worked as an Account Executive.

50.    In his role as Account Executive, FE16 was responsible for selling and servicing accounts within his territory in Mississippi.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

51.    By reason of their positions as officers, directors, and/or fiduciaries of Vestis and because of their ability to control the business and corporate affairs of Vestis, the Individual Defendants owed Vestis and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Vestis in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in

furtherance of the best interests of Vestis and its shareholders so as to benefit all shareholders equally.

52.     Each director and officer of the Company owes to Vestis and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

53.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Vestis, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

54.     To discharge their duties, the officers and directors of Vestis were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

55.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Vestis, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its

shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Vestis's Board at all relevant times.

56.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

57.    To discharge their duties, the officers and directors of Vestis were required to exercise reasonable and prudent supervision over the management,

policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Vestis were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Georgia, and the United States, and pursuant to Vestis's own Business Conduct Policy and Code of Ethics for Senior Financial Officers, and Corporate Governance Guidelines (collectively, the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Vestis conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Vestis and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Vestis's operations would comply with all applicable laws and Vestis's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

58.     Each of the Individual Defendants further owed to Vestis and the shareholders the duty of loyalty requiring that each favor Vestis's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

59.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Vestis and were at all times acting within the course and scope of such agency.

60.     Because of their advisory, executive, managerial, directorial, and controlling positions with Vestis, each of the Individual Defendants had access to adverse, non-public information about the Company.

61.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Vestis.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

62.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

63.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty,

unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

64.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Vestis was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

65.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the

accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

66.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Vestis and was at all times acting within the course and scope of such agency.

## VESTIS'S CODE OF CONDUCT

67.    Vestis's Business Conduct Policy (the "Code of Conduct") represents that it "supports [Vestis's] commitment to earn [] trust and helps guide us to ensure our actions reflect the highest standards of integrity. The [Code of Conduct] applies to all of us-including teammates, senior leaders, our board of directors, and anyone acting on Vestis's behalf. Each of us is responsible for protecting Vestis's integrity and reputation."

68.    In the section, "The BCP Applies to Everyone" the Code of Conduct in relevant part, states:

> THOSE WHO FAIL TO COMPLY with the BCP, fail to disclose suspected violations, fail to cooperate with an investigation of a possible violation, or knowingly make a false report may be subject to disciplinary action up to and including termination of employment.

69.    In the section "Compliance with the Laws" the Code of Conduct states:

> It is Vestis's policy to comply with the laws in each country, state, and locality in which Vestis conducts business. This includes, but is not limited to, compliance with employment, labor, and workplace rules; data privacy, cybersecurity, environmental, antitrust, gifts and

entertainment, and securities laws; and the United States Foreign Corrupt Practices Act, and other anticorruption/ anti-bribery laws. Every Vestis teammate and any person or entity acting on Vestis's behalf must adhere to the restrictions and standards imposed by those laws and regulations.

70.    In the section "Accurate Books and Reporting" the Code of Conduct states:

> We must ensure that our books and records are complete, accurate, honest, and timely. You must never falsify, or ask or cause someone else to falsify, company books or records or customer documentation by making false entries through deliberate omission, or by creating records without knowledge of their accuracy. All expense reports, accounts payable, invoice transmittals, inventory summaries, customer billing data, payroll data, and any other similar documents or records must be complete, accurate, honest, and timely. You may not open or maintain any undisclosed or unrecorded corporate account, fund, or asset or any account with a misleading purpose.
> You must not provide false or misleading information to anyone, including the Vestis Legal Department, Vestis's Internal Audit Department, or our independent
> auditors.

71.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers

and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct

## VESTIS'S AUDIT COMMITTEE CHARTER

72.     Vestis also maintains an Audit Committee Charter (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee charter states the following regarding the purpose of the Audit Committee:

> The Audit Committee shall assist the Corporation's Board of Directors (the "Board") in its oversight of: the performance of the Corporation's internal audit function and the independent auditors; the accounting, reporting and financial practices of the Corporation, including the quality and integrity of the Corporation's financial statements, including internal controls; the qualifications and independence of the independent auditors; the Corporation's compliance with
> legal and regulatory requirements; risk assessment and management; and the Corporation's information technology ("IT") functions and security program. The Committee shall also prepare an audit committee report as required by the Securities and Exchange Commission (the "SEC") to be included in the Corporation's annual proxy statement.
>
> In fulfilling their responsibilities hereunder, it is recognized that members of the
> Committee are not, and do not represent themselves to be, accountants or auditors by profession or experts in the fields of accounting or auditing, including in respect of auditor independence. In addition, notwithstanding the Committee's purposes set forth above, the Committee is not responsible for certifying the Corporation's financial statements or guaranteeing the auditor's report. The fundamental responsibility for the Corporation's financial statements and

disclosures rests with management. The Committee may carry out additional functions and adopt additional policies and procedures as may be appropriate in light of changing business, legislative, regulatory, legal or other conditions. The Committee shall also carry out any other responsibilities and duties delegated to it by the Board from time to time related to the purposes of the Committee set forth in this charter.

73.    Under the heading "Functions, Powers and Responsibilities" in a subsection titled "Financial Reporting" the Audit Committee Charter states:

1.Meet to review and discuss with management and the independent auditors prior to public dissemination the Corporation's annual audited financial statements and quarterly financial statements, including: (A) the profit and loss statement, the balance sheet and statement of cash flows including variances and changes therein, (B) an analysis prepared by management and/or the independent auditor, setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, (C) the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," including accounting policies that may be regarded as critical; and (D) major issues regarding the Corporation's accounting principles and financial statement presentations, including any significant change in the Corporation's selection or application of accounting principles and financial statement presentations; and receive reports from the independent auditors as required by SEC and/or Public Company Accounting Oversight Board (PCAOB) rules.
2. Review with management and discuss the Corporation's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including the type and presentation of information, paying particular attention to any pro forma or adjusted non-GAAP information. Such discussions may be in general terms (i.e., discussion of the types of information to be disclosed and the type of presentations to be made).
3. In consultation with the independent auditors, management and the internal auditors, review the Corporation's financial reporting processes and accounting standards and principles.

4. Review periodically the effect of regulatory and accounting initiatives, as well as offbalance sheet structures (if any), on the financial statements of the Corporation.

5. Review with the independent auditors and the Vice President, Internal Audit: (i) any audit problems or other difficulties encountered by the auditor in the course of the audit process, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any disagreements with management, and (ii) management's responses to such matters. Without excluding other possibilities, the Committee may wish to review with the independent registered public accounting firm (i) any accounting adjustments

that were noted or proposed by such firm but were "passed" (as immaterial or otherwise), (ii) any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent registered public accounting firm to the Corporation.

6. Recommend to the Board whether the Corporation's annual financial statements should be included in the Annual Report on Form 10-K.

7. Review and approve all reports and disclosure with respect to matters related to the Committee required to be included in the Corporation's Form 10-K or proxy statement, as applicable, pursuant to applicable rules and regulations of the SEC.

8. Review with the General Counsel legal matters that may have a significant impact on the Corporation's financial statements.

9. Review any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal controls.

74.    Under the same heading, in the subsection titled "Accounting Controls

and Personnel" the Audit Committee Charter states:

1.Review the adequacy and effectiveness of the Corporation's internal controls over financial reporting, including any significant deficiencies or material weaknesses in and significant changes to internal controls reported to the Committee by the independent

auditors or management. Review any special audit steps adopted in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

2. Discuss with management and the independent auditors the Corporation's guidelines and policies with respect to risk assessment and risk management. While it is the responsibility of senior management to assess and manage the Corporation's exposure to risk, the Committee

shall discuss the Corporation's major financial risk exposure and the steps management has taken to monitor and control such exposures, including without limitation insurance.

3. Periodically review, with the independent auditor, the internal audit function's

responsibility, budget, staffing, the scope and results of internal auditing procedures, and performance. Annually review and recommend changes (if any) to the internal audit charter.

4. Review and concur on the appointment, compensation, removal and replacement of the Vice President, Internal Audit. The Vice President, Internal Audit shall report to the Committee and administratively to the Chief Financial Officer.

5. Set clear hiring policies for the Company's hiring of employees or former employees of the independent auditors. At a minimum, these policies must provide that any independent registered public accounting firm may not provide audit services to the Corporation if the CEO, controller, CFO, chief accounting officer or any person serving in an equivalent capacity for the Corporation was employed by the independent registered public accounting firm and participated in any capacity in the audit of the Corporation during the one-year period preceding the date of

the initiation of the audit.

6. Review and evaluate the strategy with respect to and adequacy of the Corporation's IT functions and security program, compliance and controls. Review the Corporation's IT functions and security controls with management and, at least annually, with the Board.

7. Consider the risk of management's ability to override the Company's internal controls.

8. Review and assess the scope and readiness of the Company's business continuity plans.

75.    Under the same heading in a subsection titled "Business Conduct and Ethics" the Audit Committee Charter states:

1. Establish procedures for: (i) the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters; and (ii) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters.

2. Monitor compliance with the Corporation's Business Conduct Policy and review and approve any requests for waivers of the Business Conduct Policy for executive officers and directors.

3. Establish, maintain and administer a policy with regard to related party transactions. Discuss with the independent registered public accounting firm its evaluation of the Company's identification of, accounting for, and disclosure of its relationships with related parties as set forth under the standards of the PCAOB.

4. Conduct investigations of allegations of management misconduct or other matters within the Committee's scope of responsibilities when deemed necessary or desirable.

5. Discuss with management the Corporation's guidelines and policies with respect to the use of artificial intelligence and associated risk management.

76.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and

reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

77.    Vestis, headquartered in Roswell, Georgia, is the product of the Spinoff, which was the September 2023 separation by Aramark, a global provider of food and facilities services, of its AUS segment into Vestis, an independent public company. Before the Spinoff, the Aramark segment that would later become Vestis, AUS, provided rental uniforms and workplace supplies and services such as delivering uniforms, laundering rental linens, providing floor mats and towels; providing restroom services; and providing first-aid supplies, among other things. Vestis provides the same services and products today.

78.    Vestis is a "route-based business" focused on the B2B market. The route-based business dispatches delivery drivers from one of the Company's laundry plants or "market centers" to deliver the Company's services and products to customers.

79.    Making correct deliveries on time is critical to the success of Vestis. As one former Regional VP of AUS explained:

> I'll give you an example of what can go bad. ***You have a company's inventory management, one of the biggest things. That's a big issue***

***in the industry***.[3] If you're an employer and you have let's say 20 employees and you're paying for a program, then I come and deliver your garments, pick them up, deliver them every week, and ***every week, you're missing two shirts, a pair of pants, that causes a strain on your business.*** Now your employees don't have uniforms to work their complete workweek. They either have to wear a garment twice or they have to go ahead and wear their own garments. That puts a big strain. ***When I say service, when I say the inventory management piece, that's critical when it comes to a uniform program.*** A lot of companies buy into it, and then they see that it's not working because they're not getting the garments back.

80.    Prior to the Spinoff, AUS was the smallest segment of Aramark and lacked much needed capital investment. AUS trailed behind its competitors by a significant margin, only growing 1-2% a year compared to its competitors at 6.3% per year.

81.    Due to the pandemic, Aramark was burdened by $7.4 billion worth of debt in 2021. To deal with the amount of debt Aramark was facing, Aramark decided to spinoff AUS and in return receive a large cash payment.

82.    Aramark hired Defendant Scott as the new CEO of AUS on October 10, 2021, to begin working toward the Spinoff. To begin laying the foundation for AUS to succeed as a standalone business, Defendant Scott began publicly emphasizing the "great investments" Aramark had recently made in AUS.

---

[3] All emphasis added unless stated otherwise.

83.     Defendant Scott at the December 9, 2021, Aramark Investor Day (the "2021 Aramark Investor Day") stated how Aramark invested in a new customer relationship system which she described was

> the enabler for many things that we want to do across this business. It is one place to house all of our data and information about our customers to see the movement of our routes that we can understand how efficient we're being to allow us to have very ease of doing business activities with our customers.

84.     During the 2021 Investor Day, Defendant Scott further stated that the new customer relationship system was "already more than 70% implemented" and would enable AUS to run efficiently and generate growth, allowing it to better compete with its competitors.

85.     On May 10, 2022, Aramark announced the Spinoff in a press release which stated that Vestis would pay Aramark $1.5 billion in cash during the Spinoff process. To ease investors, Aramark continued to strongly emphasize the "recent investments" in Vestis" – including investments in "an operating platform [ABS] that is anticipated to enable efficiencies across all customer touchpoints including supply chain logistics, inventory management, and back office support". The press release also touted Vestis's sales force which had resulted in "new client wins" and an "improved" customer retention rate of more than 150 basis points. As a result of these improvements, Vestis was purportedly "well-positioned to succeed independently."

86.    During a conference call on the same day, Aramark's CEO John Zillmer discussed how AUS was ready to go public and that Aramark waited to spinoff AUS until these investments were made, in specific saying "the investments we've made over the last couple of years, in both sales infrastructure, growth infrastructure, the route accounting systems, are largely behind us. And we are now well positioned to accelerate the growth and improve the margins in the business."

87.    For the remainder of 2022, Defendants repeatedly emphasized that Vestis had finally implemented technologies that would allow them to succeed independently. For example, Defendant Zillmer stated at a June 8, 2022, Baird Consumer, Technology & Services Conference that the new investments in Vestis' "route accounting system were complete and that AUS was "beginning to drive the benefits of that system throughout the enterprise" and that AUS was "well ahead" of the investment in "sales infrastructure and leadership development and training."

88.    At the same conference, Defendant Scott stated that in the past AUS had not been "as focused as we should have" and that the "first thing" Defendant Scott did upon assuming her position as CEO was to "install a proper logistics function":

> So *the first thing that we've done around operations, candidly, is to install a proper logistics function*. And so there is a massive

opportunity in this model, of course, to leverage logistics know-how to drive efficiencies. So efficient routes, really driving density across those routes so that you can leverage your footprint and lower your cost to serve. ***And so we're very, very focused on logistics.*** And I think that's been an area that we have not been as focused as we should have been in the past. And so that's really not related to what you do when you spin out, it's just really related to what do you do to really run this business really well. Whether we're inside Aramark or outside of Aramark, ***we should be really, really expert at logistics because we're running a route-based business***. And going back to your question of kind of what surprised you, I mean, candidly, I love our team and I think we're doing amazing work, ***but I was surprised that we weren't doing more sophisticated things around routing and scheduling and logistics.***

89.    At a conference on May 31, 2023, conference, Zillmer discussed how AUS was now caught up with its competitors, stating "if you look at our sales volumes, our net new business wins and our [customer] retention[,] we're right there with our competitors." Zillmer further boasted about AUS's performance as customers were renewing their contracts. Zillmer also dismissed lack of performance compared to its competitors on a one off "fuel recovery fee" which did not affect AUS's customers.

90.    At a conference on June 8, 2023, Defendant Scott stressed the importance of customer retention as a fundamental element of success for Vestis and that Vestis currently had "outstanding customer relationships." Defendant Scott further stated that Vestis's success in customer retention and growth was because of "the investments [Aramark] already made in [the Company's] infrastructure."

91.    On August 15, 2023, Vestis filed a Form 10 registration statement (as amended, the "Registration Statement") with the SEC, which became effective on September 8, 2023, and included a preliminary information statement (the "Information Statement") that was executed on September 11, 2023.

92.    The Information Statement furthered the Defendants statements about the growth of the Company, boasting about the Company's "[l]ong tenured [c]ustomer relationships" and "recurring revenue streams", which were made possible "due to the quality of [Vestis'] services and products" and its "ability to deliver on-time."

93.    The Information Statement also stated that the Company had a customer retention rate "in excess of 90%," which provided Vestis with a "significant competitive advantage[]" and was a "key competitive strength[]." Maintaining a customer rention rate is vital to the Company since any rate below 90% would indicate that Vestis had serious issues with customer retention. Vestis's competitors usually maintained a customer retention rate of 95% and internally the Company considered any retention rate below 90% to be "DEFCON One". The Information Statement further stated that its strong "customer retention" would deliver "high quality revenue growth" for the Company.

94.    The Information Statement also purported that the Company had successfully implemented critically important management technology called

"Telematics." Telematics is essential to route-based companies by combining GPS technology and telecommunications which allows users of Telematics to plan more efficient routes by the use of real-time data, delivery schedules, and delivery statuses.

95.    The Information Statement further stated its implementation of Telematics: "We seek to increase route efficiency with technology and processes that reduce travel time, distance and fuel consumption. For example, our telematics technology allows us to proactively reduce fuel usage by limiting idling through real-tie, in-cab driver alerts."

96.    On September 13, 2023, Vestis executives held an inaugural "Vestis Analyst Day" call. During the analyst day call, Defendant Scott, Vestis's incoming CEO, represented that she had "joined Aramark Uniform Services a couple of years ago with the intent of preparing the business for this exact moment." Defendant Scott continued to tout the investments Aramark made stating that "the investments that Aramark already quite wisely made in this business, the ramping of the sales force, the investment of our operating system platform"- investments that were "in place," "in our run rate" and had "been made".

97.    During the investor presentation on Vestis Analyst Day, the Company stated that "the single highest value growth lever is retention, which we achieve

through excellence." Defendants further stated that it longstanding relationships with national accounts would continue to propel growth for the Company.

98.    Defendant Scott also highlighted the quality of Vestis's services stating that Vestis is "doing exactly what we say we're going to do, deliver on the promise, show up on time every week, deliver the products and services that you … promise to your customers and do that with consistency and excellence."

99.    Defendant Scott continued to emphasize the investments Vestis had made to its technology systems so Vestis can ensure accurate, on-time deliveries for customers. In specific, Defendant Scott stated the "implementation of [the] ABS system", which had been "launched across our entire network," and gave team members the "digital tools in their hands so they can interact mor seamlessly and more efficiently with the customer."

100.    Defendant Scott further characterized Vestis as a growth business, stating that there would be "5% to 7% top line growth on" CAGR and "deliver 18% to 20% adjusted EBITDA margin" by fiscal year 2028. Even though Vestis' uniform business reported flat revenue year-over-year, Defendant Scott stated that the flatness was "very intentional" and was purportedly due to "nonregrettable losses around some accounts that just didn't make sense for our portfolio."

101.   Also, during the analyst day call, Defendant Dillon, Vestis's incoming CFO, represented that the Company would operate with an "annual capital investment [that] will be about 3% of revenue."

102.   Also, during the analyst day call, Defendant Scott explained the Company's carefully constructed plan to generate growth, stating the following, in relevant part:

> We have been extremely prudent about the way that we built this plan, and we've been very measured about modest investments, leveraging the investments that Aramark already quite wisely made in this business, the ramping of the sales force, the investment of our operating system platform, those investments are in place. They've been made, they're in our run rate and we're going to take great advantage of those.

103.   Regarding growth, Defendant Dillon stated that Vestis's 5% to 7% growth would arise from (i) "2% to 3% from high quality new growth," (ii) "2% to 3% from retaining our existing customers," and (iii) "about a percent of pricing on average." Regarding price and inflation worries, Defendant Dillon stated, "[W]e've also demonstrated our ability to take price and pass-through inflation as one of the ways to deal with an inflationary environment."

104.   Also, during the analyst day conference, the Individual Defendants emphasized the investments Vestis's sales team For instance, Defendant Dillon stated, "most importantly, the sales force numbers stay with us because we think we're at the right team level." Defendant Scott similarly stated that sales team

members "have reached their stride" and are "now hitting the productivity levels that we desire for them." Additionally, Defendant Scott stated that "[W]e're managing performance very effectively and we're making sure that we get the right revenue per head."

105.  On October 2, 2023, Vestis's common stock began trading on the NYSE under the symbol "VSTS." The Company is now "a leading provider of uniform rentals and workplace supplies across the United States and Canada" to more than 300,000 locations. Vestis's clients span several industries, including manufacturing, hospitality, retail, pharmaceuticals, and healthcare.

106.  Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about Vestis's business, operations, and prospects. In particular, the Individual Defendants failed to disclose to shareholders and investors that: (1) Aramark had chronically underinvested in the AUS segment before the Spinoff; (2) due to the foregoing, Vestis suffered from outdated facilities and an underperforming sales force; (3) as a further result of foregoing, Vestis experienced "service gaps" before and after the Spinoff that prevented the Company from executing the impressive growth plan the Individual Defendants had so publicly emphasized; and (4) the Company failed to maintain internal controls. In light of the above, the Individual Defendants' statements about the

Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

107.   Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

### *The Company's Former Employees Reveal Vestis Lost A Significant Amount of Customers Before the Spinoff due to Poor Service and Price Increases*

108.   Despite the Individual Defendants' consistent claims to the contrary, the testimony provided by the former employees in the Securities Class Action shows the issues the Company faced with customer retention before the Spinoff.

109.   For example, FE1 stated before the Spinoff in 2023, he saw internal documents revealing Aramark was experiencing customer retention issues, stating that "[customer] losses there during my time consulting certainly outweighed the gains." FE1 stated he could "see the bleeding of the customers and the type of customers and businesses that were being lost versus the businesses that the sales teams were signing up." For example, prior to the Spinoff, FE1 saw that due to the Company's "repetitive failures" a "giant" and long-term customer, Pape Material Handling, left for a competitor, Cintas.

110.   Customer departures were largely damaging to the Company, with FE1 stating that if retention rates fell below 90%, it was considered a "DEFCON One" situation.

111.  FE1 also sated that Defendant Scott was "absolutely" aware of the service issues that were driving customers away, stating that the "reports were very clear" and there were "not a lot of ways to hide quality and service" problems in the Company.

112.  FE3 testified that two large national accounts, Tyson's Chicken and Whole Foods, left Vestis due to its poor service. FE3 stated that AUS "had a lot of knowledge that there were a lot of service issues that were not being correct [for Tyson's Chicken] since at least 2022." FE3 also reported that Defendant Scott met with Tyson Chicken's leadership in an effort to not lose the account. FE3 also stated that "[a]nytime you lose a customer in the uniform business it usually boils down to one of two things: you either lose it because someone else undercut your price or you have so many service issues that cannot be overcome."

113.  FE4 also testified that several of his customers who entered into three-to-five year contracts would leave after a short-term stating that "[s]ervice was so bad that these clients left within the first 30 to 90 days. I promise these customers all of this stuff and they immediately left."

114.  FE5 also testified that the Company's assertion of medium-sized businesses closing was the reason for the Company's customer loss was not true. FE5 further testified that during his four years at Vestis, he never once had a

medium-sized customer go out of business and his customers only left because of the Company's poor service.

### *Former Employees Reveals the Lack of Investment by Defendants in the Company's Old and Outdated Facilities Caused the Service and Quality Issues.*

115.  Despite the Individual Defendants' consistent claims to the contrary, the testimony provided by the former employees in the Securities Class Action show that Vestis needed serious capital investment to improve its facilities in order to increase the quality of its services.

116.  Aramark entered the uniform services industry by acquiring a series of large plants to clean uniforms. However, many of the plants were old, some of which were built in the 1980's, and as FE1 testified that Aramark had "a lot of big plants that were running a lot of product through them and were badly in need of upgrade or replacement." FE1 further stated that "[i]f you have old plants, and you are not willing to invest in them then you have a disaster on your hands." FE1 added "there was a failure to invest in their facilities which are not a detriment to providing quality services."

117.  The facilities in Portland, Oregon and Memphis, Tennessee were so poor that FE1 stated that it felt like "any day, the city or some government entity would come in and just put a red tag on the building and say, 'You can't operate that here anymore.'"

118.    FE1 also testified that the true reason COO Synek left was due to the outdated facilities and the Individual Defendants' refusal to make the investments needed to get them up to date. FE1 stated that he believed Synek felt like he was "misled" as to "commitments to quality, commitments to resources, commitments to capital."

119.    FE3 further corroborated the belief that Synek left due to the outdated facilities. FE3 testified that Synek was "trying to make changes, and they were not being received" and that there was a fundamental disagreement between Defendant Scott and Synek about the facilities.

120.    FE5 testified that Aramark did nothing to improve Vestis' operations or infrastructure, and that after the Spinoff, Vestis continued to have quality issues.

121.    FE10 testified that the outdated facilities caused uniforms to "look terrible" and were delivered to customers "wrinkled," shrunk to the wrong sizes, and otherwise "fade out really quickly."

122.    FE4 testified about similar issues with the plant where he worked. He stated that Vestis "rode that equipment until the very last bit of it worked" and that the facility was at least 20 years outdated. FE4 further added that the issues at his plant caused the quality issues customers complained about before choosing to leave Vestis.

***Former Employees Reveal that Vestis' Service Functions Were So Bad Its Service Was "Nonexistent"***

123.  In addition to the quality issues, FE10 also testified that Aramark struggled with its services, "whether it be product shortages or product quality or not having a good customer management program." FE10 further elaborated stating that customers getting incorrect items was one of the "biggest pain pints" for customers, and he pointed out that no matter how cheap Vestis's prices are, customers will "leave when you[r] service is bad."

124.  FE12 also testified that customer items would routinely get lost after they were picked up for servicing. FE12 further testified that the quality of the barcodes used for tracking was so poor due to the low quality of the uniforms that they were unreadable.

125.  FE10 also testified to issues with barcodes, stating that there "was no scanning going on" and as a result customers would be frustrated with the Company's lack of inventory management. The lack of scanning was further corroborated by FE1, who stated that the Company did not force any of its employees to actually scan the barcodes, and that in many plants it was viewed as optional.

126.  FE1 testified that Aramark's grading system used to evaluate product quality actually worsened after the Spinoff. FE1 stated that the Company either changed its product grading standards or was trying to extend the life of its products to improve short term profits.

127. FE12 also testified about the quality issues with the Company's products, stating that he had lost several customers to Cintas because of the quality issues. FE12 also noted that in one instance, an account he had just signed received their first shipment of rags, which were delivered with holes in them. FE12 also stated "it was very embarrassing to deliver such poor-quality products" and cites it as a reason of why he left the Company. FE12 still receives text messages from customers complaining about the quality of the products.

128. FE16 also testified about losing customers due to quality issues with the products and services. FE16 stated that the Company had constantly misplaced aprons and towels or returned items with holes in them and still dirty. Uniforms in particular caused issues for FE16, where FE16's customers would routinely not receive the same number of uniforms back that were sent to be serviced.

129. FE16 testified about issues with the length of delivery for some products. For new customers who ordered uniforms, FE16 testified that even though the timeline for initial delivery was four to six weeks, customers routinely had to wait for more than five months before they received the uniforms.

### Former Employees Reveal They Were Told To Ignore Customer Complaints

130. Former employees not only testified about the Company's poor service but also had poor customer relationships. FE4 testified that he was instructed not to take customer calls and was specifically told by "management" to

"gloss" over customer complaints and to even block some customers from calling. FE4 further elaborated stating his "job was to go out there, sign them up, promise them everything and then don't talk to them anymore."

131.   FE8 testified about issues with the Company's billing procedures. FE8 stated that he saw "fees that had been tacked on to the client's bill" when comparing the differences between what the Company and customer agreed to and the actual bill received by the customer. When FE8 brought this up to his supervisor, he was told to direct his customers to call a 1-800 number, which both FE7 and FE8 testified was just a "run around" for clients.

132.   FE12 testified that customers consistently complained about incorrect invoices and they were being overcharged. FE5 corroborated this when he testified that executives were trained to "not explain the contract with the customers" unless asked.

133.   FE5 testified that the long-term contracts that the Company and client would enter into allowed Vestis to ignore complaints from customers. For example, FE5 recalled a conversation with another employee who was laughing at the amount of complaints from Cracker Barrel, a large national account for Vestis, because Cracker Barrel still had two years left on the contract and that Cracker barrel was "stuck with them."

134.    FE5 further testified that Vestis would misrepresent its customer retention rate to attract new customers and cover for its poor service, stating that he was told to tell potential customers the Company's customer retention rate was 95% in his territory of Louisiana and Mississippi, while the actual retention rate was only between 10% to 15%.

**False and Misleading Statements**

***November 29, 2023 Earnings Conference Call***

135.    On November 29, 2023, before market opening, the Company issued a press release that reported the Company's financial performance for the fourth quarter of 2023. Later that same day, the Company held an earnings conference call to discuss the financial results. During the call, Defendant Scott stated, "[W]e are pleased to share our outlook for fiscal year 2024, a revenue growth rate of 4% to 4.5%, which is well above our historical norms of approximately 2%." Defendant Scott further represented that, "throughout 2023, we continued to establish a strong foundation for profitable growth[,]" and as a result, "we are well-positioned to deliver healthy revenue growth and margin expansion."

136.    When questioned about flat revenue Defendant Scott claimed the flatness was "purposeful" stating "[w]e are just purposely at times exiting some business … So  would expect you should see a muted uniforms growth rate again

in FY '24, but that is a very purposeful decision to grow very strategically under high-quality verticals and existing some underperforming businesses."

137.  Later during the earnings conference call, in replying to an analyst's request for comment "on recent trends in add/stop, net new, and of client retention," Defendant Scott said: "[W]e continue to focus on creating an amazing customer experience[,]" and "we are seeing really, really great feedback from our customers around these initiatives, and so we feel very, very good about the establishment of a service excellence culture across our company." Defendant Scott further stressed that Vestsis had "continue[d] to deliver retention rates that are above 90%."

138.  Defendant Scott also reiterated their long-standing relationships with "national account customers" stating that they "stay more than 20 years with us. So they're very valuable customers and the lifetime value is great."

139.  These statements were false and misleading because: (i) the Company did not establish "service excellence" because the Company was unable to provide on-time, accurate, and quality service; (ii) the Company was in fact losing large national accounts during this period, including a loss of two large national accounts in the months leading up to the spinoff; and (iii) the Company's customer retention rate was in fact not 90% but was actually 85%.

***December 21, 2023 Form 10-K***

140.   On December 21, 2023, Vestis filed its annual Form 10-K Report to the SEC (the "2023 Form 10-K"), which was signed by Defendants Scott and Dillon.

141.   The 2023 Form 10-K stated:

*Long-Tenured Customer Relationships*: We deliver to over 300,000 customer locations and serve businesses which participate across numerous industries. We maintain long-term relationships with our customers due to the quality of our services and products, our ability to deliver on-time and our ability to provide workplace supplies and services that support our customers' individual strategies and needs.

142.   The 2023 Form 10-K further stated:

*Environmental, Social and Governance (ESG)*
We have been engaged in actively supporting environmental, social and governance (ESG) efforts. Below are key areas of focus the Company has undertaken and intends to continue to pursue:
***
•We focus on the efficient use of fossil fuels to reduce related emissions. We seek to increase route efficiency with technology and processes that reduce travel time, distance and fuel consumption. ***For example, our new telematics technology allows us to proactively reduce fuel usage by limiting idling through real-time, in-cab driver alerts***

143.   In regard to the Company's operational risk and customer retention, the 2023 Form 10-K stated:

Our success depends on our ability to retain our current customers, renew our existing customer contracts and obtain new business on commercially favorable terms. Our ability to do so generally depends on a variety of factors, including the quality, price and responsiveness of our services, as well as our ability to market these services

effectively and differentiate ourself from our competitors. In addition, customers are increasingly focused on and requiring us to set targets and meet standards related to environmental sustainability matters, such as greenhouse gas emissions, packaging, waste and wastewater. When we renew existing customer contracts, it is often on terms that are less favorable or less profitable for us than the then-current contract terms. In addition, we typically incur substantial start-up and operating costs and experiences lower profit margin and operating cash flows in connection with the establishment of new business, and in periods with higher rates of new business, we have experienced and expect to continue to experience negative impact to our profit margin and our cash flows. There can be no assurance that we will be able to obtain new business, renew existing customer contracts at the same or higher levels of pricing or that our current customers will not turn to competitors, cease operations, elect to in-source or terminate contracts with us. These risks may be exacerbated by current economic conditions due to, among other things, increased cost pressure at our customers, tight labor markets and heightened competition in a contracted marketplace. The failure to renew a significant number of our existing contracts, including on the same or more favorable terms, could have a material adverse effect on our business, financial condition or results of operations, and the failure to obtain new business could have an adverse impact on our growth and financial results.

144.    These statements were false and misleading because (i) the Company was not delivering their services on-time which was causing them to lose long-standing relationships; (ii) the Company had not in fact implemented Telematics technology into their fleet; and (iii) the "operational risk" described by the Company had actually already known to have occurred because of Vestis' operational deficiencies and its inability to deliver its products and services on-time.

**<u>The Truth Begins to Emerge As the</u>**
**<u>False and Misleading Statements Continue</u>**

*February 6, 2024 Synek Resignation*

145.   The truth began to emerge when Company COO Chris Synek ("Synek") announced his resignation for "personal reasons", effective immediately. Synek was appointed COO on September 11, 2023, and had only been with the Company five months.

146.   This statement was false and misleading because as revealed by the former employees, Synek actually left due to the outdated facilities and the Individual Defendants' refusal to make the investments needed to get them up to date.

*February 7, 2024 Press Release and Earnings Call*

147.   The truth continued to emerge on February 7, 2024, before market opening, the Company issued a press release (the "February Press Release") that reported the Company's financial performance for the first quarter of 2024. The February Press Release reported revenue of just 2.5%, missing the projected 2024 revenue growth of 4 to 4.5%. Despite this large miss, the February Press Release "reaffirm[ed] Fiscal 2024 guidance" and therefore purportedly still "expect[ed] to deliver revenue growth in the range of 4.0 to 4.5%" for the year.

148.   Later that same day, the Company held an earnings conference call (the "Q1 2024 Earnings Call") to discuss the financial results. During the Q1 2024

Earnings Call, Defendant Scott stated that she had personally "monitor[ed] [customer departures] very closely" and had undertaken extensive efforts to "go[] pretty deep and granular to understood what are those patterns and trends around why customers leave." Defendant Scott then stated that according to her analysis, the revenue miss was due to a "trend" of "small and medium enterprise customers with an uptick in business closures."

149.   Despite Defendant Scott's previous comments about the loss of some customers as "purposeful" and "very intentional", Defendant Scott revealed that Vestis had suffered an "unfortunate loss" of a "national account" prior to the Spinoff. Defendant Scott stated that an :unfortunate loss from [Vestis'] Clean Room business" had occurred "last year" and the loss was so significant that it had "continue[d] to flow through" the Company's revenue streams in 2024. Defendant Scott stated that she did not disclose this earlier because "it wasn't a strategic loss" and that it was "regrettable":

> And then we also have a national account loss, but we haven't talked about it a lot because it wasn't a strategic loss. It was an unfortunate loss from our Clean Room business last year, and it was a loss that continues to flow through in the first 2 quarters of this year, which also affects that Uniforms number. And again, we haven't talked about it a lot because it's a regrettable loss, It wasn't part of our strategy . . .

150.   Even with this disclosure, Defendant Scott still did not reveal that the Company had actually lost two major national accounts prior to the Spinoff.

Assuring investors that the loss of this national account was not due to the Company's service issues but was just "the nature of doing business."

151.  Defendant Scott also sought to ease investors about Synek's sudden departure. Defendant Scott "reassure[ed] everyone that [Synek's] departure does not impact our strategy or our ability to deliver against our strategy," and emphasized the Company's plan "ha[d] been in motion for a very long time, for the 2.5 or 2-plus years that I've been here" so "we feel really confident that we will continue down the path that we are down." Defendant Scott later stated that the team had been reported to her before the COO role was created and now the team is back reporting to her just as they had been for the "2-plus years that [she had] been [t]here."

152.  Defendant Scott announced that the Company would be implementing off-cycle price increases that would allow Vestis to "take price" in the second half of the year to appease investor concerns that the Company would not hit its revenue guidance of 4 to 4.5%. Defendant Scott stated the Company had "been surgically analyzing opportunities to take price more strategically" and that "we will be taking price around certain specific kind of product lines" with certain customers, in addition to "tak[ing] some more general pricing" in the near future.

153.    Defendant Scott further reassured investors by stating that the changes in pricing actions were not necessary to reach the Company's revenue guidance and were just to give "additional comfort to give [investors] confidence."

154.    On the Q1 2024 Conference Call, the Individual Defendants continued to emphasize the implementation of the systems that were put in place from the investment of Aramark. In specific, the Individual Defendants further emphasized its use of Telematics to ensure correct, on-time deliveries. Defendant Scott stated that the Company had "successfully deployed new [T]elematics technology across 89% of our fleet and fully deploy[ed] new routing and scheduling technology and processes across North America," was "all a part of our strategy to establish the capability to continuously optimize our network and our routes." The Individual Defendants continued to emphasize that Vestis "had already completed" multiple "network optimization events," delivering a "step change improvement in the way we operate."

155.    On the Q1 2024 Earnings Call, Defendant Scott stated in regards to sales that Vestis was "seeing really good progress with our frontline account executives, driving revenue per head."

156.    On the Q1 2024 Earnings Call, Defendants continued to maintain that the Company's customer retention rate had continued to be "greater than 90" and

the Company had not suffered any massive customer churn and there were "no real surprises as it related to retention and where we expected to be."

157.   These statements were false and misleading because: (i) the Company did not actually have the ability to "take price" but rather had to issue substantial discounts in order to prevent a mass exodus of customers; (ii) customer loss was not "intentional" or "very purposeful" but rather customers were leaving due to the poor quality of the Company's services; (iii) the Company had not in fact implemented Telematics technology into the Company's fleet of vehicles; (iv) the Company had no basis to boast about a customer retention rate of 90% when the Company did not disclose that Vestis was currently undergoing a mass exodus of customers; and (v) customer loss and growth in the uniform business being flat was not due to an uptick in business closures, but rather customers were leaving because of the Company's poor services.

158.   On this news, Vestis' stock price fell almost 13% from a price of $22.30 per share on February 6, 2024, to a close at $19.42 per share on February 7, 2024.

## The Truth Emerges

### *May 2, 2024 Press Release*

159.   On May 2, 2024, the truth fully emerged when Vestis issued a press release that reported the Company's financial performance for the second quarter

of the 2024 fiscal year. The press release revealed another quarter of low revenue performance, of just $705 million, which constituted only a 0.9% increase from the same fiscal quarter a year earlier. Additionally, the press release revealed a "Revised Fiscal Year 2024 Outlook," with Vestis "now expect[ed] to deliver fiscal 2024 revenue growth in the range of [negative] (1)% to 0%." The press release contained a statement from Defendant Scott which revealed that "Our results in the quarter and our outlook for the year are not in line with expectations."

### *May 2, 2024 Earnings Call*

160.   On a earnings conference call held that same day, Defendants made a series of admissions, including that: (i) despite Defendants' claims that Vestis had implemented systems to ensure accurate and on-time delivery of the Company's products, Vestis did not even "have a process to verify that the truck has been loaded accurately and that all of the product that needs to go to our customer is, in fact, being delivered to our customer"; (ii) Telematics had not been "successfully deployed" across the Company's fleet at all, and the Company was only expecting to begin using Telematics at some point in the future; (iii) as a result, Vestis lost a "large amount" of customers due to severe "service gaps" where the Company could not even provide the most basic services expected of them; (iv) the majority of these loses occurred before the Spinoff and included two major national accounts; (v) because of the significant loss of accounts prior to the Spinoff,

Vestis' customer retention rate materially fell below 90% even when the Defendants boasted that it was "in excess of" 90%; (vi) due to the significant service issues, Vestis could not increase pricing but rather had to give significant discounts in order to retain customers; and (vii) Defendants had known about the service and retention issues before the Spinoff, but did not disclose these issues during the Relevant Period.

161.   First, Defendant Scott disclosed that dispute the claims that Vestis had "fully deploy[ed] new routing and scheduling technology and processes across North America", Vestis did not even "have a process to verify that the truck has been loaded accurately and that all of the product that needs to go to our customer is, in fact, being delivered to our customer." Defendant Scott further stated that " we [were] not tight on our processes as it related to disciplined loading of tucks, delivering on-time, delivering full loads" and thus Vestis needed to "do a better job on being on time, being complete, being fully loaded and putting metrics around that, so that we can ensure that we're delivering consistently the expectations that our customers have for us."

162.   Second, Defendant Scott admitted that despite statements from Defendants saying the Company introduced Telematics to 89% of the Company's fleet of vehicles, no such thing had actually occurred. Defendant Scott stated that

Telematics was still not being utilized, and the Company was only expecting to use the technology at some point in the future.

163.   Third, Defendants admitted that revenue flatness and customer losses were not purposeful" or "very intentional" or "an uptick in customer closures" but rather because of the Company's "service gaps." Defendant Scott stated that the "root causes" of why customers were leaving the Company were due to "service experiences related to our procedures" that were specifically "related to ho we are delivering the load on time and incomplete loads." Defendant Scott further stated: "we know that *more than 70% of the [customer] cancellations are due to causes that are within our control*."

164.   Fourth, Defendants admitted that Vestis had lost two major national accounts before the Spinoff was complete. Defendants further admitted that one of the principal reasons for the Company's poor performance was due to a "large amount of rollover losses from FY 2023." Defendant Dillon stated that "[c]ustomer losses reduced second quarter revenues by 9% year-over-year, more than offsetting our new business growth," and no less than two-thirds of that lost revenue, or $40.8 million, was because of the customer losses known to the Defendants before the Spinoff, none of which were disclosed to investors. Defendant Dillon stated that 6% of the 6% of the lost revenue came from "known customer losses as we existed fiscal 2023" and "3% from customer losses during this fiscal year."

Defendant Dillon further admitted that the Company was still "currently absorbing [the] losses incurred in FY 23."

165.   Fifth, while the Defendants boasted about a customer retention rate "in excess f 90%", Defendants now admitted that the customer retention rate in Q4 2023 had fallen to 85%.

166.   Sixth, while the Defendants stated that they would "take price" on the second half of 2024, in reality the Company's services were so deficient that not only could the Company not increase pricing, in order to retain the customers they had, they needed to issue dramatic discounts. During the Relevant Period, Vestis had to "deliberately moderate" pricing because "service efficacy and price sensitivity go hand-in-hand" – such that Vestis' "service gaps ha[d] driven price sensitivity, as fully satisfied customers typically don't leave because they've received a price increase." Defendant Scott later admitted that "the need to enhance our service … resulted in pricing and volume erosion during the renewal process."

167.   Seventh, Defendant Scott stated that: these challenges have been in our business for quite some time" and were "not related to the spin [] I'll be clear about that." Defendant Dillon also stated that Defendants knew the service issues impacted customer retention rate, stating that they "knew the impact coming in of the lower retention rate."

168.   Reactions from the market analysts on the call are telling.  JP Morgan analyst Andrew Steinerman stated that "your plan had been just a couple of months ago for a targeted area price increase, and then you pivoted to a price decrease." Stephanie Moore, an analyst from Jefferies, referenced the Company's executives' "change in tone [] in the last 90 days," and the Company's "reversal in pricing capabilities." After the truth emerged during the call, JP Morgan downgraded the Company's stock, citing "company specific challenges." Barclays assessed "the need for further investment is more apparent than ever." Likewise, Baird analysts reported on the "structural issues [that] will take time to fix," and questioned the Individual Defendants' reliability, noting "credibility is low."

169.   On this news, the price per share of Vestis stock fell $8.31, or 45%, from closing at a price of $18.47 per share on May 1, 2024, to close at a price of $10.16 per share on May 2, 2024.

170.   The statements made in ¶¶135-158 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose to shareholders and investors that: (1) Aramark had chronically underinvested in the AUS segment before the Spinoff; (2) due to the foregoing, Vestis suffered from outdated facilities and an underperforming sales force; (3) as a further result of foregoing, Vestis experienced "service gaps" before and after the

Spinoff that prevented the Company from executing the impressive growth plan the Individual Defendants had so publicly emphasized; and (4) the Company failed to maintain internal controls. In light of the above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## DAMAGES TO VESTIS

171.  As a direct and proximate result of the Individual Defendants' conduct, Vestis will lose and expend many millions of dollars.

172.  Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

173.  Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

174.  Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any

investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

175. As a direct and proximate result of the Individual Defendants' conduct, Vestis has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

176. Plaintiff brings this action derivatively and for the benefit of Vestis to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Vestis, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 10(b) and 21D of the Exchange Act and the aiding and abetting thereof.

177. Vestis is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

178. Plaintiff is, and has been at all relevant times, a shareholder of Vestis. Plaintiff will adequately and fairly represent the interests of Vestis in enforcing and

prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

179.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

180.   A pre-suit demand on the Board of Vestis is futile and, therefore, excused.   At the time of filing of this complaint, the Board consists of the following nine individuals: Defendants Holloman, Burke, Jokinen, McKee, Pertz, Whitney, Williams (the "Director Defendants"), and non-parties Keith Meister and Bill Goetz (together with the Director Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors that were on the Board at the time of the filing of this complaint.

181.   Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

182. In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

183. Additional reasons that demand on Defendant Holloman is futile follow. Defendant Holloman has served as a Company director and as the Chairman of the Board since the Spinoff. Defendant Holloman currently serves as the interim Executive Chairman, President and CEO. Defendant Holloman has received and continues to receive compensation for his role as a director as described above. As a trusted Company director and as the Chairman of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Holloman breached his fiduciary duties, faces a substantial likelihood of liability,

is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

184.   Additional reasons that demand on Defendant Burke is futile follow. Defendant Burke has served as a Company director since the Spinoff. Defendant Burke also serves as the Chair of the Board's Nominating, Governance, and Corporate Responsibility Committee and as a member of the Compensation and Human Resources Committee. Defendant Burke has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Burke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

185.   Additional reasons that demand on Defendant Jokinen is futile follow. Defendant Jokinen has served as a Company director since the Spinoff. Defendant Jokinen also serves as the Chair of the Board's Audit Committee and as a member of the Compensation and Human Resources Committee. Defendant Jokinen has received and continues to receive compensation for her role as a director as

described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. For these reasons, Defendant Jokinen breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

186. Additional reasons that demand on Defendant McKee is futile follow. Defendant McKee has served as a Company director since the Spinoff. Previously, Defendant McKee served as executive vice president and chief human resources officer for Aramark from 2004 until 2022. Defendant McKee has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. For these reasons, Defendant McKee breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

187.   Additional reasons that demand on Defendant Pertz is futile follow. Defendant Pertz has served as a Company director since the Spinoff. Defendant Pertz is currently the Lead Independent Director. Defendant Pertz also serves as the Chair of the Board's Compensation and Human Resources Committee and as a member of the Audit Committee. Defendant Pertz has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Pertz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

188.   Additional reasons that demand on Defendant Whitney is futile follow. Defendant Whitney has served as a Company director since the Spinoff. Defendant Whitney also serves as a member of the Audit Committee. Defendant Whitney has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over

reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. For these reasons, Defendant Whitney breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

189.   Additional reasons that demand on Defendant Williams is futile follow. Defendant Williams has served as a Company director since the Spinoff. Defendant Williams also serves as a member of the Compensation and Human Resources Committee and the Nominating, Governance, and Corporate Responsibility Committee. Defendant Williams has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. For these reasons, Defendant Williams breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

190.   Additional reasons that demand on the Board is futile follow.

191.   Defendants Jokinen (as chair), Whitney, and Pertz served as members of the Audit Committee during the Relevant Period. In violation of the Audit

Committee Charter, Defendants Jokinen, Whitney, and Pertz failed to adequately review and discuss the Company's press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, Defendants Jokinen, Whitney, and Pertz further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

192.    In violation of the Code of Ethics, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 10(b) and 21D of the Exchange Act. In violation of the Code of Ethics, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations, and properly report violations of the Code of Ethics and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

193.   Vestis has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Vestis any part of the damages Vestis suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

194.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

195.   The acts complained of herein constitute violations of fiduciary duties owed by Vestis's officers and directors, and these acts are incapable of ratification.

196.   The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged

herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Vestis. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Vestis, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

197.  If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Vestis to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

198.  Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least five of the Director Defendants, cannot

consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

199.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

200.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Vestis's business and affairs.

201.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

202.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Vestis.

203.   In breach of their fiduciary duties owed to Vestis, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Aramark had chronically underinvested in the AUS segment

before the Spinoff; (2) due to the foregoing, Vestis suffered from outdated facilities and an underperforming sales force; (3) as a further result of foregoing, Vestis experienced "service gaps" before and after the Spinoff that prevented the Company from executing the impressive growth plan the Individual Defendants had so publicly emphasized; and (4) the Company failed to maintain internal controls. In light of the above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

204.   The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

205.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Vestis's securities. The Individual Defendants, in good faith, should have

taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

206. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

207. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Vestis has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

208. Plaintiff, on behalf of Vestis, has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

209. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

210. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Vestis.

211. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Vestis that was tied to the performance or artificially inflated valuation of

Vestis or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

212.   Plaintiff, as a shareholder and a representative of Vestis, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

213.   Plaintiff, on behalf of Vestis, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

214.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

215.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Vestis, for which they are legally responsible.

216.   As a direct and proximate result of the Individual Defendants' abuse of control, Vestis has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Vestis has sustained and continues to sustain

significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

217.   Plaintiff, on behalf of Vestis, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

218.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

219.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Vestis in a manner consistent with the operations of a publicly held corporation.

220.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Vestis has sustained and will continue to sustain significant damages.

221.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

222.   Plaintiff, on behalf of Vestis, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

223.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

224.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

225.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Vestis to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

226.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

227.   Plaintiff, on behalf of Vestis, has no adequate remedy at law.

## SIXTH CLAIM

### Against Defendants Scott and Dillon for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

228.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

229.   Vestis and Defendants Scott and Dillon are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Scott's and Dillon's willful and/or reckless violations of their obligations as officers and/or directors of Vestis.

230.   Defendants Scott and Dillon, because of their positions of control and authority as officers and/or directors of Vestis, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Vestis, including the wrongful acts complained of herein and in the Securities Class Action.

231.   Accordingly, Defendants Scott and Dillon are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

232.   As such, Vestis is entitled to receive all appropriate contribution or indemnification from Defendants Scott and Dillon.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Vestis, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Vestis;

(c)    Determining and awarding to Vestis the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Vestis and the Individual Defendants to take all necessary actions to reform and improve Vestis's corporate governance and internal procedures to comply with applicable laws and to protect Vestis and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations

and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Vestis to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Vestis restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Respectfully Submitted,

**WEBB, KLASE & LEMOND, LLC**

*/s/ G. Franklin Lemond, Jr.*
E. Adam Webb
  Georgia Bar No. 743910
G. Franklin Lemond, Jr.
  Georgia Bar No. 141315
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Telephone: (770) 444-9594
Email: Adam@WebbLLC.com
      Franklin@WebbLLC.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net