UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE VESTIS CORPORATION DERIVATIVE LITIGATION | Case No. 1:25-cv-02726-TWT<br>(Consolidated)<br><br>**DEMAND FOR JURY TRIAL**<br><br>**PUBLIC REDACTED VERSION** |

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Michael Gribe ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Vestis Corporation ("Vestis" or the "Company"), files this Verified Amended Shareholder Derivative Complaint against Kimberly Scott ("Scott"), Rick Dillon ("Dillon"), Phillip Holloman ("Holloman"), Richard Burke ("Burke"), Tracy Jokinen ("Jokinen"), Lynn McKee ("McKee"), Doug Pertz ("Pertz"), Mary Anne Whitney ("Whitney"), and Ena Williams ("Williams") (collectively, the "Individual Defendants," and together with Vestis, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Vestis, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution against Defendants Scott and Dillon under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of internal corporate documents produced by Defendants to Plaintiff's

counsel,[1] a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Vestis, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Vestis's directors and officers from October 2, 2023 to May 1, 2024, both dates inclusive (the "Relevant Period").

2. Vestis, headquartered in Roswell, Georgia, is the product of a September 2023 separation by Aramark, a global provider of food and facilities services, of its Aramark Uniform Services ("AUS") segment into an independent public company (the "Spinoff"). Before the Spinoff, AUS provided rental uniforms and workplace supplies and services such as delivering uniforms, laundering rental linens, providing floor mats and towels, providing restroom services, and providing first-aid supplies, among other things. Vestis provides those same services and products today.

3. The Spinoff occurred while Aramark was burdened by substantial debt. Following the COVID-19 pandemic, Aramark's debt had reached approximately $7.4 billion and its leverage exceeded seven times earnings before interest, taxes, depreciation and amortization ("EBITDA"). Facing market concern regarding its balance sheet, Aramark announced plans to substantially

[1] References to "VESTIS220RESPONSE000___" are to the Books and Records. Unless otherwise specified, all internal quotation marks and citations herein are omitted and all emphasis is supplied. Additionally, capitalization in quoted material may be altered.

reduce its leverage. As part of the Spinoff, Vestis incurred approximately $1.8 billion in financing and paid nearly $1.5 billion in cash to Aramark.

4. To make the Spinoff successful, Aramark and Vestis needed to convince investors that AUS had been transformed into a business capable of succeeding independently. Defendant Scott had joined AUS in October 2021 as its President and Chief Executive Officer ("CEO") for the express purpose of preparing the business to become an independent company, and Defendant Dillon joined AUS in May 2022 to serve as its Chief Financial Officer ("CFO") and likewise prepare it for the Spinoff. In the period leading up to the Spinoff, Aramark, Scott, and Dillon repeatedly represented that the investments required to improve Vestis's operations had already been made and that Vestis was positioned to achieve substantially greater growth as an independent company.

5. On September 13, 2023, shortly before the start of the Relevant Period, Defendants Scott and Dillon hosted Vestis's inaugural "Analyst Day." Defendant Scott stated that she had "joined Aramark Uniform Services a couple of years ago with the intent of preparing the business for this exact moment," and emphasized that the investments necessary to drive future growth "are in place, they've been made, they're in our run rate." Defendant Dillon identified three principal drivers of Vestis's anticipated growth: attracting new customers, retaining existing customers, and increasing prices. Dillon further stated that Vestis had "demonstrated our ability to take price."

6. Vestis's Analyst Day investor presentation likewise stated that the Company's "single highest value growth lever is retention, which we achieve through service excellence" and touted the Company's "sticky" customer base and approximately 26-year tenure of its national accounts. Defendant Scott emphasized that Vestis's team was "focused on doing exactly what we say we're going to do, deliver on the promise, show up on time every week, deliver the products

and services that you promise to your customers and do that with consistency and excellence." Scott also touted Vestis's implementation of its ABS operating system across the Company's network, which purportedly provided employees with digital tools and data analytics that enabled them to interact more efficiently with customers and provide "excellent service." And when asked about flat revenue growth in Vestis's core uniforms business, Scott attributed the weakness not to problems with the business, but to "non-regrettable" customer losses involving accounts that "just didn't make sense for our portfolio" and were "very intentional."

7. After Vestis became an independent public company, Scott and Dillon continued to make public statements concerning the same subjects, and Vestis continued to disseminate substantially the same message. On November 29, 2023, Defendant Scott again attributed muted growth in Vestis's uniforms business to the Company's "very purposeful" decision to exit certain underperforming businesses. Scott further represented that Vestis was providing an "amazing customer experience," was receiving "really, really great feedback" from its customers, had established a "service excellence culture across the company," and "continue[d] to deliver retention rates that are above 90%." Scott again stressed the strength of Vestis's national account relationships, representing that those customers remained with Vestis for more than twenty years. Vestis also announced fiscal 2024 revenue-growth guidance of 4.0% to 4.5%.

8. Significantly, on December 21, 2023, Vestis filed its annual report on Form 10-K with the SEC (the "2023 Form 10-K"). The 2023 Form 10-K was signed by Defendants Scott and Dillon as well as every Defendant on the Company's Board of Directors (the "Board")—Holloman, Burke, Jokinen, McKee, Pertz, Whitney, and Williams (collectively, the "Director Defendants"). The 2023 Form 10-K repeated Vestis's representations that its customer retention rate was "in excess of 90%" and that the Company maintained long-term customer relationships

because of "the quality of our services and products" and its "ability to deliver on-time." The 2023 Form 10-K also represented that Vestis's "new telematics technology" allowed the Company to increase route efficiency through, among other things, real-time driver information. And the 2023 Form 10-K warned investors only as a potential future risk that Vestis's failure to retain its customers or renew existing contracts could adversely affect the Company's business and financial results.

9. On February 7, 2024, Vestis filed a current report on Form 8-K with the SEC reporting quarterly revenue growth of only 2.5%, well below the Company's full-year revenue-growth guidance of 4.0% to 4.5%. Nevertheless, Vestis reaffirmed its fiscal 2024 guidance, stating that the Company "continues to expect to deliver revenue growth in the range of 4.0 to 4.5% through our focus on providing service excellence to our customers and delivering high-quality growth" and continued to expect an adjusted EBITDA margin of approximately 14.3%. The accompanying earnings release quoted Defendant Scott as stating that Vestis's "high-quality growth strategy is effective" and that she remained confident in the Company's full-year financial outlook. During the earnings conference call held later that day, Scott further stated that "[w]e expect acceleration in our growth rates."

10. Scott and Dillon also reassured investors that Vestis could support its growth through additional pricing. Defendant Scott stated that Vestis would "be taking price" during the balance of the year and told investors that those pricing opportunities provided "additional comfort" that Vestis would achieve its 4.0% to 4.5% revenue-growth guidance. Defendant Dillon similarly represented that the contemplated "surgical pricing" was already incorporated into Vestis's guidance and that the Company was "really just capitalizing on" those opportunities.

11. Defendant Scott further represented that Vestis had "successfully deployed new [T]elematics technology across 89% of our fleet and fully deploy[ed] new routing and scheduling technology and processes across North America." And when analysts questioned Vestis's customer retention and the reasons customers were leaving, Scott represented that Vestis continued to maintain retention "greater than 90%," that there were "no real surprises as it relates to retention," and that the Company had gone "pretty deep and granular" in examining customer departures. According to Scott, customer attrition and the weakness in uniforms growth were attributable in material part to "an uptick in business closures" among small- and medium-sized customers, rather than deficiencies in Vestis's service.

12. However, each of the above statements was knowingly false and misleading at the time it was made, as Vestis's own admissions would later confirm. Vestis had not been providing the "service excellence" it publicly touted; rather, the Company suffered from longstanding operational deficiencies that, for example, impaired its ability to provide complete and timely deliveries. Vestis also was not experiencing merely strategic or "purposeful" customer losses, but had suffered significant pre-Spinoff customer losses—including at least two large national accounts—that continued to materially depress revenue throughout fiscal 2024. Vestis's customer retention rate had fallen to approximately 85.8% during the fourth quarter of fiscal 2023. The Company's service deficiencies were themselves causing customers to leave and impairing Vestis's ability to increase pricing. And while Vestis had installed Telematics technology, it was not effectively using that technology to ensure accurate, on-time delivery and route efficiency.

13. Indeed, in denying the motions to dismiss filed in the related federal securities fraud class action, *Plumbers, Pipefitters & Apprentices Local No. 112 Pension Fund v. Vestis Corp.*, No. 1:24-cv-02175-SDG (N.D. Ga.) (the "Securities Class Action"), the United States District Court

for the Northern District of Georgia held that the plaintiffs had sufficiently alleged that Scott, Dillon, Vestis, and Aramark made actionable misstatements concerning precisely these subjects. The Court explained that those defendants had made optimistic statements regarding Vestis's business while omitting past-performance information necessary for investors to assess "Vestis's customer-retention prowess, its service-delivery capabilities, and its underlying financial health." *Plumbers, Pipefitters & Apprentices Local No. 112 Pension Fund v. Vestis Corp.*, 808 F. Supp. 3d 1369, 1383 (N.D. Ga. 2025) (the "Securities MTD Order").

14. Among other things, the Securities MTD Order found sufficiently alleged that Vestis was "bleeding" customers while the challenged public statements touted retention above 90%; that the Company lost an average of approximately $9 million in recurring revenue each week during the five weeks before the Spinoff and approximately $4.2 million per week from August 2023 through April 2024; and that Vestis's retention rate had fallen to 85.8% during the fourth quarter of fiscal 2023. *Id.* at 1383-84. The Court further found sufficiently alleged that Vestis lacked the operational capacity to provide the quality, on-time service Defendants publicly touted, including because it lacked a process to ensure that trucks were loaded accurately and customers received complete deliveries and was not effectively utilizing its Telematics technology in day-to-day operations. *Id.* at 1384-85.

15. The Securities MTD Order likewise found sufficiently alleged that Scott, Dillon, Vestis, and Aramark misled investors concerning the financial health of Vestis's recurring-revenue uniforms business. *Id.* at 1385-86. Vestis ultimately admitted that at least two large national accounts lost before the Spinoff caused a material revenue growth headwind in fiscal 2024 and that more than $40 million of known pre-Spinoff customer losses continued to depress the Company's growth. *Id.* at 1386. Defendant Scott further admitted that more than 70% of customer

cancellations were attributable not to business closures or other outside factors, but "to causes that are within our control"—namely, Vestis's own service failures—and that those service failures caused "price sensitivity" and pricing and volume "erosion." *Id.* The Court therefore held that Defendants' representations could mislead a reasonable investor into believing that Vestis was profiting from its recurring-revenue model by providing excellent service to loyal customers "when in truth and in fact" Vestis was doing the opposite. *Id.*

16. The Court also held that these allegations, considered together, gave rise to a strong inference that Defendants Scott and Dillon knew they were presenting investors with a rosy picture of Vestis's business that was inconsistent with its actual performance. *Id.* at 1388-90. Among other things, the Court relied upon Scott's and Dillon's admissions concerning "known" pre-Spinoff customer losses, Vestis's 85.8% retention rate, the importance of customer retention and service to Vestis's business, Scott's and Dillon's roles in preparing Vestis for the Spinoff, internal reports concerning customer losses, and Scott's direct involvement in attempting to retain a major national account. *Id.* The Court concluded that it was at least as likely that Scott and Dillon "knew how fundamental service failures were costing Vestis millions of dollars in recurring revenue every week, but hid the truth from investors until plummeting revenues forced them to come clean." *Id.* at 1390.

17. [redacted]

[redacted]

18. [redacted]

19. [redacted]

[redacted]

20. [redacted]

21. On May 2, 2024, the truth emerged when Vestis issued a press release reporting the Company's financial performance for the second quarter of fiscal 2024. The press release contained a statement from Defendant Scott acknowledging that "[o]ur results in the quarter and our outlook for the year are not in line with expectations" and announced revised fiscal 2024 revenue-growth guidance of negative 1% to 0%. During the earnings call that followed, Defendant Scott admitted that Vestis had moderated pricing to improve retention while addressing its service deficiencies; that the pricing decision would negatively impact revenue and EBITDA; and that "more than 70% of the [customer] cancellations are due to causes that are within our control."

Defendant Dillon further disclosed the substantial impact of known customer losses carried over from fiscal 2023.

22. On this news, the price per share of Vestis stock fell $8.31, or approximately 45%, from a closing price of $18.47 per share on May 1, 2024, to $10.16 per share on May 2, 2024.

23. As alleged herein, throughout the Relevant Period, the Individual Defendants made and/or caused Vestis to make materially false and misleading statements and failed to disclose material adverse facts about Vestis's business, operations, and prospects. In particular, the Individual Defendants failed to disclose, among other things, the extent of Vestis's customer losses and declining retention; that purportedly strategic customer losses included significant non-strategic losses caused by Vestis's service deficiencies; that Vestis lacked the service and operational capabilities necessary to provide the "service excellence" and consistent, complete, on-time deliveries Defendants publicly touted; that Vestis was not effectively utilizing Telematics to ensure accurate and timely deliveries; and that the resulting service deficiencies impaired Vestis's ability both to retain customers and to increase prices. Accordingly, the Individual Defendants' statements concerning the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

24. Due to the Individual Defendants' misconduct—which has subjected the Company and Defendants Scott and Dillon to the sustained Securities Class Action and which has further subjected the Company to the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly compensated by the Company while they were breaching their fiduciary duties and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many

millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and other misconduct.

25. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, the substantial likelihood of the Director Defendants' liability in this derivative action, Defendants Scott and Dillon's potential liability in the Securities Class Action, and the Director Defendants' inability to consider claims concerning their own conduct with the requisite level of disinterestedness and independence, a majority of the Board cannot consider a demand to commence litigation on behalf of the Company. Thus, Plaintiff brings this action on behalf of the Company to recover for the harm caused by the Individual Defendants.

**JURISDICTION AND VENUE**

26. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

27. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

28. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

29. Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, Vestis is headquartered in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

**Plaintiff**

30. Plaintiff first acquired Aramark common stock in 2021, received Vestis shares in connection with Aramark's September 30, 2023 distribution of Vestis shares to its stockholders, and continues to hold his Vestis stock today. Plaintiff thus has continuously held shares of Vestis common stock at all relevant times.

**Nominal Defendant Vestis**

31. Vestis is a Delaware corporation with principal executive offices at 1035 Alpharetta Street, Suite 2100, Roswell, Georgia. Vestis common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "VSTS."

**Defendant Scott**

32. Defendant Scott served as Vestis's CEO and as a Company director from the Spinoff until March 2025. Previously, she served as President and CEO of Aramark's AUS segment from October 2021 until the Spinoff.

33. The proxy statement filed with the SEC on December 16, 2024 (the "2024 Proxy Statement") stated the following about Defendant Scott:

> Ms. Scott serves as the President and Chief Executive Officer of Vestis. She joined Aramark in October 2021 to serve as President and Chief Executive Officer of Aramark Uniform Services and to prepare Vestis to be a standalone, independent public company. Previously, Ms. Scott served as Chief Operating Officer of Terminix Global Holdings, Inc. (NYSE: TMX) from January 2021 to September 2021, overseeing operations for both the residential and commercial businesses, after having served as President of Terminix Residential from December 2019 to January 2021. Prior to Terminix, she served as President of Rubicon Global from July 2018 to September 2019, a role that followed an 11-year career at Brambles Limited, which culminated in Ms. Scott serving as President, CHEP North America for four years. Early in her career, Ms. Scott gained industrial manufacturing experience at the General Electric Company (NYSE: GE) and U.S. Steel (NYSE: X). She serves as a member of the board of directors for Greif, Inc. (NYSE: GEF).

**Defendant Dillon**

34. Defendant Dillon served as Vestis's Executive Vice President and CFO from the Spinoff until February 14, 2025. Previously, he served as CFO of Aramark's AUS segment from May 2022 until the Spinoff.

35. The 2024 Proxy Statement stated the following about Defendant Dillon:

> Rick Dillon, 53, serves as an Executive Vice President and the Chief Financial Officer of Vestis. Mr. Dillon joined Aramark in May 2022 to serve as Chief Financial Officer of Aramark Uniform Services and to prepare Vestis to be a standalone, independent public company. Prior to joining Aramark, Mr. Dillon served as Executive Vice President and Chief Financial Officer of Enerpac Tool Group (NYSE: EPAC) from December 2016 to April 2022. In addition to his experience at Enerpac, Mr. Dillon served as Executive Vice President and Chief Financial Officer at Century Aluminum (NASDAQ: CENX) for approximately three years. Prior to that, he held progressive leadership roles at publicly traded companies in finance and accounting, including Joy Global, Newell Brands, and Briggs and Stratton, and in public accounting. He also serves as a member of the board of directors of Adient plc (NYSE: ADNT).

**Defendant Holloman**

36. Defendant Holloman has served as a Company director and as the Chairman of the Board since the Spinoff. Defendant Holloman also served as interim Executive Chairman, President and CEO, from March 18, 2025 to June 1, 2025. Defendant Holloman also serves as a member of the Board's Nominating, Governance, and Corporate Responsibility Committee.

37. The proxy statement filed with the SEC on January 8, 2026 (the "2026 Proxy Statement") stated the following about Defendant Holloman:

> Background:
>
> Mr. Holloman has served as the Chairman of the Board of Directors since September 2023. He also served as the interim Executive Chairman, President and Chief Executive Officer of Vestis from March 18, 2025 to June 1, 2025. Mr. Holloman retired from Cintas as president and chief operating officer in 2018. Other roles during his 22-year career with Cintas included rental division president and chief operating officer, senior vice president of global supply chain management, executive champion of Six Sigma Initiatives, vice president of distribution/production planning and vice president of engineering and

construction. Mr. Holloman is a founding member of Cintas' diversity committee and received the Excalibur Award, the company's highest distinction reserved for business executives who demonstrate excellence during their tenure. He serves as a member of the board of directors for the BlackRock Fixed Income Board and was previously a member of the board of directors for Pulte Group (NYSE: PHM) and Rockwell Automation (NYSE: ROK). In addition, Mr. Holloman serves on the board of trustees for the University of Cincinnati.

Qualifications:

Mr. Holloman is well qualified to serve on our Board because of his extensive industry and senior management experience and deep knowledge of corporate strategy and operations.

**Defendant Burke**

38. Defendant Burke has served as a Company director since the Spinoff. Defendant Burke also serves as the Chair of the Board's Nominating, Governance, and Corporate Responsibility Committee and as a member of the Compensation and Human Resources Committee. During the Relevant Period, Defendant Burke also served as a member of the Audit Committee.

39. The 2026 Proxy Statement stated the following about Defendant Burke:

Background:

Mr. Burke previously served as chairman of the board and chief executive officer of Advanced Disposal Services, Inc. (NYSE: ADSW), an integrated environmental services company, from 2012 to 2020. Prior to that role, he served as president and chief executive officer of Veolia Environmental Services North America Corp., a solid waste and hazardous waste management company, from 2009 to 2012, and as president of Veolia ES Solid Waste, from 2007 to 2009. Mr. Burke currently serves on the board of U.S. Infrastructure Company, an underground utility locating business owned by Partners Group, and Biffa, a U.K. waste and recycling business owned by Energy Capital Partners.

Qualifications:

Mr. Burke is well qualified to serve on our Board because of his extensive industry and senior management experience and deep knowledge of corporate strategy, operations and finance.

**Defendant Jokinen**

40. Defendant Jokinen has served as a Company director since the Spinoff. Defendant Jokinen also serves as the Chair of the Board's Audit Committee.

41. The 2026 Proxy Statement stated the following about Defendant Jokinen:

> Background:
>
> Ms. Jokinen has over 30 years of finance and accounting experience across various global industries, where she focused on accelerating profitable growth and business transformation in her role as chief financial officer for both public and private companies. Most recently, Ms. Jokinen was executive vice president and chief financial officer of Vyaire Medical, a medical device company, from March 2020 to January 2022. She previously held the role of executive vice president and chief financial officer at Acelity, from June 2017 until it was acquired by 3M (NYSE: MMM) in October 2019. She also served as chief financial officer of G&K Services, a publicly traded uniform services company, from 2014 until it was acquired by Cintas (NDAQ: CINTAS) in 2017. Ms. Jokinen currently sits on the board of directors at Alamo Group (NYSE: ALG), Array Technologies (NDAQ: ARRY), and Candela Corporation.
>
> Qualifications:
>
> Ms. Jokinen is well qualified to serve on our Board because of her experience in the uniform service industry and her financial and board-level experience with publicly traded companies.

**Defendant McKee**

42. Defendant McKee has served as a Company director since the Spinoff. Previously, Defendant McKee served as Executive Vice President and Chief Human Resources Officer for Aramark from 2004 until 2022. Defendant McKee also serves as a member of the Compensation and Human Resources and Nominating, Governance and Corporate Responsibility Committees.

43. The 2026 Proxy Statement stated the following about Defendant McKee:

> Background:
>
> Ms. McKee most recently served as executive vice president and chief human resources officer for Aramark from 2004 to 2022. Prior to this role, Ms. McKee held several key positions for Aramark from 1980 to 2004, including director of

employee relations, vice president for corporate human resources, where she was responsible for executive development and compensation, and senior vice president for human resources of Aramark Global Food, Hospitality and Facility Services. In addition, Ms. McKee led Aramark's corporate communications, diversity, equity and inclusion, sustainability, community relations, corporate real estate and air and meeting services. Ms. McKee is currently a member of the board of directors of WSFS Financial Corporation (NASDAQ: WSFS) and Highmark Inc.

Qualifications:

Ms. McKee is well qualified to serve on our Board because of her extensive corporate experience in employment, compensation and benefits matters at the regional, national and international levels. In addition to her expertise in human resources, Ms. McKee brings crisis management, corporate governance, executive leadership and public company oversight skills.

**Defendant Pertz**

44. Defendant Pertz has served as a Company director and as the Vice Chairman of the Board since the Spinoff. Defendant Pertz also serves as the Chair of the Board's Compensation and Human Resources Committee and as a member of the Audit Committee.

45. The 2026 Proxy Statement stated the following about Defendant Pertz:

Background:

Mr. Pertz has served as the Vice Chairman of the Board of Directors since September 2023. He also served as the interim Lead Independent Director of Vestis from March 18, 2025 to June 1, 2025, Mr. Pertz previously served as the executive chairman of the board of The Brink's Company (NYSE: BCO), a global leader in total cash management and secure logistics, until his retirement in May 2023. Mr. Pertz also served as the president, chief executive officer and a member of the board of The Brink's Company from June 2016 to May 2022. Prior to Brink's, he served as president and chief executive officer of Recall Holdings, having led Recall from its initial public offering in 2013 to the strategic sale of the business in 2016. He previously also served as chief executive officer of several other public companies, including IMC Global (predecessor to Mosaic Co. (NYSE: MOS)) and Culligan Water Technologies. Mr. Pertz currently serves on the board of directors for Vital Records Control and previously served on the board of directors for Advance Auto Parts (NYSE: AAP).

Qualifications:

> Mr. Pertz is well qualified to serve on our Board because of his operational expertise in branch and route-based logistics, business-to-business services, channel and brand marketing and growth through acquisition.

**Defendant Whitney**

46. Defendant Whitney has served as a Company director since the Spinoff. Defendant Whitney also serves as a member of the Audit Committee.

47. The 2026 Proxy Statement stated the following about Defendant Whitney:

> Background:
>
> Ms. Whitney has served as executive vice president and chief financial officer of Waste Connections (NYSE: WCN) since February 2021 and has more than 25 years of deep financial expertise. During her 19-year tenure at Waste Connections, Ms. Whitney has held executive-level finance roles, each with increased responsibilities, including senior vice president and chief financial officer from July 2018 to February 2021, senior vice president of finance, vice president of finance and director of finance. Previously, Ms. Whitney held various finance positions at Wheelabrator Technologies.
>
> Qualifications:
>
> Ms. Whitney is well qualified to serve on our Board because of her financial experience with publicly traded companies.

**Defendant Williams**

48. Defendant Williams has served as a Company director since the Spinoff. Defendant Williams also serves as a member of the Compensation and Human Resources Committee and the Nominating, Governance, and Corporate Responsibility Committee.

49. The 2026 Proxy Statement stated the following about Defendant Williams:

> Background:
>
> Ms. Williams has served as chief operating officer of Casey's General Stores (NASDAQ: CASY), one of the leading convenience store chains in the United States, since June 2020. She is responsible for store operations, operations support, information technology, real estate, construction & maintenance, asset protection and acquisition integration. During her tenure, she has also led supply chain and fuel operations. Prior to this role, Ms. Williams served as the chief executive officer

and member of the board of directors of National HME, a technology enabled medical equipment provider, from January 2019 to March 2020. Ms. Williams also served as senior vice president and head of international operations for 7-Eleven, where she led the global growth strategy and had profit and loss responsibilities. Ms. Williams also held several positions in operations, retail, finance and planning for Mobil Oil Corporation and ExxonMobil Corporation (NYSE: XOM). Ms. Williams currently serves on the board of advisors for the Robert B. Rowling Center for Business Law and Leadership, at the SMU Dedman School of Law. She also serves on the board of directors for Children International and on the Dallas leadership committee for St. Jude.

Qualifications:

Ms. Williams is well qualified to serve on our Board because of her operational expertise and extensive industry and senior management experience.

**Relevant Non-Parties**

50. The operative complaint in the Securities Class Action incorporates statements from former employees of Vestis and/or Aramark who offered their experiences as confidential witnesses.[2] The following are former employees whose statements are referenced throughout this complaint before this Court.

***FE1***

51. FE1 worked for AUS between 2022 and May 2023. FE1 served as a consultant to the President of AUS from 2022 until May 2023, after previously serving as Vice President of Operations at AUS until 2022. In his role, FE1 had access to certain customer retention reports.

***FE3***

52. FE3 worked for AUS and Vestis between October 2004 and April 2024. During this time FE3 served as a National Sales Trainer and Compliance Manager.

[2] The former employees are identified by anonymized labels consistent with the Securities Class Action to preserve their anonymity.

***FE4***

53. FE4[3] worked for AUS and Vestis between February 2023 and March 2024. From February 2023 until October 2023 FE4 was an Account Executive for Aramark in Wixom, Michigan. From October 2023 until March 2024 FE4 was an Account Executive for Vestis in Toledo, Ohio.

***FE5***

54. FE5 worked for AUS and Vestis between November 2020 and April 2024. During this time, he worked as a Regional Account Executive for Aramark and then Vestis in Nashville, Tennessee and Baton Rouge, Louisiana.

***FE8***

55. FE8 worked for AUS and Vestis between December 2019 and April 2024. During this time, he worked as a Sales Account Executive in Nashville, Tennessee.

***FE10***

56. FE10 worked for AUS from August 2018 until July 2022. During this time FE10 was a Regional Sales VP at AUS.

57. In his role as Regional Sales VP, FE10 was responsible for sales strategy, go-to-market strategy and overseeing representatives and managers throughout his region.

***FE12***

58. FE12 worked for AUS and Vestis between November 2020 and January 2024. During this time, FE12 worked as a Regional Account Executive in the Dallas/Fort Worth region of Texas.

---

[3] FE4 reported to Thomas Mueller, a Sales Manager for the Company.

59. In his role as Regional Account Executive, FE12 was responsible for selling supplies, uniforms, and first aid items to small and medium-sized businesses.

***FE16***

60. FE16 worked for AUS and Vestis between September 2022 and July 2024. During this time, FE16 worked as an Account Executive.

61. In his role as Account Executive, FE16 was responsible for selling and servicing accounts within his territory in Mississippi.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

62. By reason of their positions as officers, directors, and/or fiduciaries of Vestis and because of their ability to control the business and corporate affairs of Vestis, the Individual Defendants owed Vestis and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Vestis in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Vestis and its shareholders so as to benefit all shareholders equally.

63. Each director and officer of the Company owes to Vestis and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

64. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Vestis, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

65. To discharge their duties, the officers and directors of Vestis were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

66. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Vestis, the absence of good faith on their part, or a conscious disregard for their duties to the Company and its shareholders that the Individual Defendants were aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company was known to, authorized, approved, ratified, and/or permitted by the other Individual Defendants serving on Vestis's Board at the relevant times.

67. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would

be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

68. To discharge their duties, the officers and directors of Vestis were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Vestis were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Georgia, and the United States, and pursuant to Vestis's own Business Conduct Policy, Code of Ethics for Senior Financial Officers, and Corporate Governance Guidelines;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Vestis conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Vestis and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Vestis's operations would comply with all

applicable laws and Vestis's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

69. Each of the Individual Defendants further owed to Vestis and the shareholders the duty of loyalty requiring that each favor Vestis's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

70. At all times relevant hereto, the Individual Defendants were the agents of each other and of Vestis and were at all times acting within the course and scope of such agency.

71. Because of their advisory, executive, managerial, directorial, and controlling positions with Vestis, each of the Individual Defendants had access to adverse, non-public information about the Company.

72. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Vestis.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

73. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

74. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

75. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Vestis was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

76. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with

knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was aware of or consciously disregarded his or her overall contribution to and furtherance of the wrongdoing.

77. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Vestis and was at all times acting within the course and scope of such agency.

**VESTIS'S CODE OF CONDUCT**

78. Vestis's Business Conduct Policy (the "Code of Conduct") represents that it "supports [Vestis's] commitment to earn [] trust and helps guide us to ensure our actions reflect the highest standards of integrity. The [Code of Conduct] applies to all of us-including teammates, senior leaders, our board of directors, and anyone acting on Vestis's behalf. Each of us is responsible for protecting Vestis's integrity and reputation."

79. In the section, "The BCP Applies to Everyone" the Code of Conduct in relevant part, states:

> THOSE WHO FAIL TO COMPLY with the BCP, fail to disclose suspected violations, fail to cooperate with an investigation of a possible violation, or knowingly make a false report may be subject to disciplinary action up to and including termination of employment.

80. In the section "Compliance with the Laws" the Code of Conduct states:

> It is Vestis's policy to comply with the laws in each country, state, and locality in which Vestis conducts business. This includes, but is not limited to, compliance with employment, labor, and workplace rules; data privacy, cybersecurity, environmental, antitrust, gifts and entertainment, and securities laws; and the United States Foreign Corrupt Practices Act, and other anticorruption/ anti-bribery laws. Every Vestis teammate and any person or entity acting on Vestis's behalf must adhere to the restrictions and standards imposed by those laws and regulations.

81. In the section "Accurate Books and Reporting" the Code of Conduct states:

> We must ensure that our books and records are complete, accurate, honest, and timely. You must never falsify, or ask or cause someone else to falsify, company books or records or customer documentation by making false entries through deliberate omission, or by creating records without knowledge of their accuracy. All expense reports, accounts payable, invoice transmittals, inventory summaries, customer billing data, payroll data, and any other similar documents or records must be complete, accurate, honest, and timely. You may not open or maintain any undisclosed or unrecorded corporate account, fund, or asset or any account with a misleading purpose.
>
> You must not provide false or misleading information to anyone, including the Vestis Legal Department, Vestis's Internal Audit Department, or our independent auditors.

82. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

**VESTIS'S CODE OF ETHICS**

83. Vestis also adopted a Code of Ethics for Senior Financial Officers (the "Code of Ethics") "to promote honest and ethical conduct, and adherence with the law." The Code of Ethics applies, among others, to Vestis's "principal executive officer" and "principal financial officer," and therefore applied to Defendants Scott and Dillon during the Relevant Period.

84. The Code of Ethics requires Vestis's Senior Financial Officers to "[e]ngage in and promote honest and ethical conduct" and to "[p]roduce, or cause to be produced, full, fair, accurate,

timely, and understandable disclosure in reports and documents that the Corporation files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Corporation." It further requires Senior Financial Officers to comply with applicable laws, rules, and regulations and provides that they shall "[b]e held accountable for adherence to this Policy."

85. As alleged herein, Defendants Scott and Dillon violated the Code of Ethics by, among other things, participating in and causing Vestis to issue materially false and misleading statements and omissions concerning the Company's customer retention, service and delivery capabilities, customer losses, growth, pricing, and other matters material to investors, rather than ensuring that Vestis's SEC filings and other public communications contained full, fair, accurate, timely, and understandable disclosure.

## VESTIS'S AUDIT COMMITTEE CHARTER

86. Vestis also maintains an Audit Committee Charter (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee charter states the following regarding the purpose of the Audit Committee:

> The Audit Committee shall assist the Corporation's Board of Directors (the "Board") in its oversight of: the performance of the Corporation's internal audit function and the independent auditors; the accounting, reporting and financial practices of the Corporation, including the quality and integrity of the Corporation's financial statements, including internal controls; the qualifications and independence of the independent auditors; the Corporation's compliance with legal and regulatory requirements; risk assessment and management; and the Corporation's information technology ("IT") functions and security program. The Committee shall also prepare an audit committee report as required by the Securities and Exchange Commission (the "SEC") to be included in the Corporation's annual proxy statement.
>
> In fulfilling their responsibilities hereunder, it is recognized that members of the Committee are not, and do not represent themselves to be, accountants or auditors by profession or experts in the fields of accounting or auditing, including in respect of auditor independence. In addition, notwithstanding the Committee's purposes

> set forth above, the Committee is not responsible for certifying the Corporation's financial statements or guaranteeing the auditor's report. The fundamental responsibility for the Corporation's financial statements and disclosures rests with management. The Committee may carry out additional functions and adopt additional policies and procedures as may be appropriate in light of changing business, legislative, regulatory, legal or other conditions. The Committee shall also carry out any other responsibilities and duties delegated to it by the Board from time to time related to the purposes of the Committee set forth in this charter.

87. Under the heading "Functions, Powers and Responsibilities" in a subsection titled "Financial Reporting" the Audit Committee Charter states:

> 1.Meet to review and discuss with management and the independent auditors prior to public dissemination the Corporation's annual audited financial statements and quarterly financial statements, including: (A) the profit and loss statement, the balance sheet and statement of cash flows including variances and changes therein, (B) an analysis prepared by management and/or the independent auditor, setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, (C) the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," including accounting policies that may be regarded as critical; and (D) major issues regarding the Corporation's accounting principles and financial statement presentations, including any significant change in the Corporation's selection or application of accounting principles and financial statement presentations; and receive reports from the independent auditors as required by SEC and/or Public Company Accounting Oversight Board (PCAOB) rules.
>
> 2. Review with management and discuss the Corporation's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including the type and presentation of information, paying particular attention to any pro forma or adjusted non-GAAP information. Such discussions may be in general terms (i.e., discussion of the types of information to be disclosed and the type of presentations to be made).
>
> 3. In consultation with the independent auditors, management and the internal auditors, review the Corporation's financial reporting processes and accounting standards and principles.
>
> 4. Review periodically the effect of regulatory and accounting initiatives, as well as offbalance sheet structures (if any), on the financial statements of the Corporation.
>
> 5. Review with the independent auditors and the Vice President, Internal Audit: (i) any audit problems or other difficulties encountered by the auditor in the course of the audit process, including any restrictions on the scope of the independent

auditor's activities or on access to requested information, and any disagreements with management, and (ii) management's responses to such matters. Without excluding other possibilities, the Committee may wish to review with the independent registered public accounting firm (i) any accounting adjustments that were noted or proposed by such firm but were "passed" (as immaterial or otherwise), (ii) any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent registered public accounting firm to the Corporation.

6. Recommend to the Board whether the Corporation's annual financial statements should be included in the Annual Report on Form 10-K.

7. Review and approve all reports and disclosure with respect to matters related to the Committee required to be included in the Corporation's Form 10-K or proxy statement, as applicable, pursuant to applicable rules and regulations of the SEC.

8. Review with the General Counsel legal matters that may have a significant impact on the Corporation's financial statements.

9. Review any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal controls.

88. Under the same heading, in the subsection titled "Accounting Controls and Personnel" the Audit Committee Charter states:

1.Review the adequacy and effectiveness of the Corporation's internal controls over financial reporting, including any significant deficiencies or material weaknesses in and significant changes to internal controls reported to the Committee by the independent auditors or management. Review any special audit steps adopted in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

2. Discuss with management and the independent auditors the Corporation's guidelines and policies with respect to risk assessment and risk management. While it is the responsibility of senior management to assess and manage the Corporation's exposure to risk, the Committee shall discuss the Corporation's major financial risk exposure and the steps management has taken to monitor and control such exposures, including without limitation insurance.

3. Periodically review, with the independent auditor, the internal audit function's responsibility, budget, staffing, the scope and results of internal auditing procedures, and performance. Annually review and recommend changes (if any) to the internal audit charter.

> 4. Review and concur on the appointment, compensation, removal and replacement of the Vice President, Internal Audit. The Vice President, Internal Audit shall report to the Committee and administratively to the Chief Financial Officer.
>
> 5. Set clear hiring policies for the Company's hiring of employees or former employees of the independent auditors. At a minimum, these policies must provide that any independent registered public accounting firm may not provide audit services to the Corporation if the CEO, controller, CFO, chief accounting officer or any person serving in an equivalent capacity for the Corporation was employed by the independent registered public accounting firm and participated in any capacity in the audit of the Corporation during the one-year period preceding the date of the initiation of the audit.
>
> 6. Review and evaluate the strategy with respect to and adequacy of the Corporation's IT functions and security program, compliance and controls. Review the Corporation's IT functions and security controls with management and, at least annually, with the Board.
>
> 7. Consider the risk of management's ability to override the Company's internal controls.
>
> 8. Review and assess the scope and readiness of the Company's business continuity plans.

89. Under the same heading in a subsection titled "Business Conduct and Ethics" the Audit Committee Charter states:

> 1. Establish procedures for: (i) the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters; and (ii) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters.
>
> 2. Monitor compliance with the Corporation's Business Conduct Policy and review and approve any requests for waivers of the Business Conduct Policy for executive officers and directors.
>
> 3. Establish, maintain and administer a policy with regard to related party transactions. Discuss with the independent registered public accounting firm its evaluation of the Company's identification of, accounting for, and disclosure of its relationships with related parties as set forth under the standards of the PCAOB.
>
> 4. Conduct investigations of allegations of management misconduct or other matters within the Committee's scope of responsibilities when deemed necessary or desirable.

> 5. Discuss with management the Corporation's guidelines and policies with respect to the use of artificial intelligence and associated risk management.

90. In violation of the Audit Committee Charter, Defendants Jokinen, Burke, Pertz, and Whitney, as members of the Audit Committee, conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, Defendants Jokinen, Burke, Pertz, and Whitney failed to adequately review the Company's financial reporting and disclosures, exercise their risk-management and oversight responsibilities, and review the adequacy and effectiveness of the Company's internal controls as required by the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background of Vestis and Aramark

91. Vestis, headquartered in Roswell, Georgia, is the product of the Spinoff, which was the September 2023 separation by Aramark, a global provider of food and facilities services, of its AUS segment into Vestis, an independent public company. Before the Spinoff, the Aramark segment that would later become Vestis, AUS, provided rental uniforms and workplace supplies and services such as delivering uniforms, laundering rental linens, providing floor mats and towels; providing restroom services; and providing first-aid supplies, among other things. Vestis provides the same services and products today.

92. Vestis is a "route-based business" focused on the business-to-business ("B2B") market. The route-based business dispatches delivery drivers also known as route service

representatives ("RSRs") from one of the Company's laundry plants or "market centers" to deliver the Company's services and products to customers. AUS would provide its customers with service on a recurring rental basis, mainly weekly, to provide clean uniforms while simultaneously picking up dirty uniforms for inspection, cleaning, replacement, or repair. AUS would also provide other services, such as cleaning and replacing towels, linens, and floormats, or providing regular restocking of safety equipment, first aid supplies, or restroom supplies.

93. As such, making correct deliveries on time is critical to the success of Vestis. As one former Regional VP of AUS explained:

> I'll give you an example of what can go bad. ***You have a company's inventory management, one of the biggest things. That's a big issue in the industry***. If you're an employer and you have let's say 20 employees and you're paying for a program, then I come and deliver your garments, pick them up, deliver them every week, and ***every week, you're missing two shirts, a pair of pants, that causes a strain on your business.*** Now your employees don't have uniforms to work their complete workweek. They either have to wear a garment twice or they have to go ahead and wear their own garments. That puts a big strain. ***When I say service, when I say the inventory management piece, that's critical when it comes to a uniform program.*** A lot of companies buy into it, and then they see that it's not working because they're not getting the garments back.

94. Prior to the Spinoff, AUS was the smallest segment of Aramark and lacked much-needed capital investment and focus. AUS had generally trailed its principal competitors, Cintas and UniFirst, with respect to capital investment over the prior decade and averaged annual revenue growth of only 1-2%, compared to approximately 6.3% for Cintas. Indeed, from 2012 to 2022, AUS's growth lagged Cintas's growth in each year and UniFirst's growth in nine of those eleven years. AUS also struggled from its lack of synergies with Aramark's principal food-service business, and periods of high debt at Aramark resulted in AUS being operated largely as a source of cash flow for Aramark's food-service operations.

95. Aramark's debt problems intensified during the COVID-19 pandemic. Aramark carried approximately $9.2 billion in debt in 2020 and $7.4 billion in 2021, with leverage exceeding seven times EBITDA in late 2021. Facing growing market concern regarding its balance sheet, Aramark announced a plan to reduce its leverage to approximately 3.0 to 3.5 times EBITDA by fiscal year 2025. The Spinoff became part of that deleveraging strategy. As part of the Spinoff, Vestis incurred approximately $1.8 billion in financing and used those proceeds to fund nearly $1.5 billion in cash payable to Aramark.

**Aramark and Scott Prepare AUS for the Spinoff and Tout Operational Improvements**

96. Aramark hired Defendant Scott as the new CEO of AUS on October 10, 2021, specifically to prepare AUS for the eventual Spinoff. In that role, Scott began publicly emphasizing the "great investments" Aramark had recently made in AUS and representing that those investments had positioned the business for future growth.

97. At Aramark's December 9, 2021 Investor Day (the "2021 Aramark Investor Day"), Defendant Scott touted Aramark's investment in a new customer relationship management system known as ABS, which she described as follows:

> [T]he enabler for many things that we want to do across this business. It is one place to house all of our data and information about our customers to see the movement of our routes that we can understand how efficient we're being to allow us to have very ease of doing business activities with our customers.

98. Defendant Scott further stated that the new customer relationship system was "already more than 70% implemented" and would enable AUS to run efficiently and generate growth, allowing it to better compete with its competitors. Specifically, Defendant Scott stated that "now that we have [ABS] in place" and "now that we have our sales team in place" the "building blocks [for growth] are now in place."

99. On May 10, 2022, Aramark officially announced the Spinoff in a press release, stating that the transaction was expected to be completed by the end of the fiscal year ending September 30, 2023 and would result in a nearly $1.5 billion cash payment to Aramark. To reassure investors that AUS was prepared to succeed as an independent company, Aramark continued to emphasize its "recent investments" in AUS, including investments in "an operating platform [ABS] that is anticipated to enable efficiencies across all customer touchpoints including supply chain logistics, inventory management, and back office support." The press release also touted AUS's strengthened sales force, which had purportedly resulted in "new client wins" and an improvement in customer retention of more than 150 basis points. As a result of these improvements, AUS was purportedly "well-positioned to succeed independently."

100. During a May 10, 2022 conference call, Aramark's CEO John Zillmer ("Zillmer") discussed how AUS was ready to go public and that Aramark waited to spin off AUS until these investments were made, in specific saying "the investments we've made over the last couple of years, in both sales infrastructure, growth infrastructure, the route accounting systems, are largely behind us. And we are now well positioned to accelerate the growth and improve the margins in the business."

101. Throughout 2022, Aramark continued to emphasize that its investments in AUS's technology and sales infrastructure had been completed and were beginning to produce benefits. For example, at the June 8, 2022 Baird Consumer, Technology & Services Conference, Zillmer stated that the investment in AUS's "route accounting system" was complete, that AUS was "beginning to drive the benefits of that system throughout the enterprise," and that AUS was "well ahead" in its investments in "sales infrastructure and leadership development and training."

102. At the same conference, Defendant Scott acknowledged that AUS historically had not been "as focused as we should have" on logistics, but represented that the "first thing" she did after becoming CEO was to "install a proper logistics function":

> So ***the first thing that we've done around operations, candidly, is to install a proper logistics function***. And so there is a massive opportunity in this model, of course, to leverage logistics know-how to drive efficiencies. So efficient routes, really driving density across those routes so that you can leverage your footprint and lower your cost to serve. ***And so we're very, very focused on logistics.*** And I think that's been an area that we have not been as focused as we should have been in the past. And so that's really not related to what you do when you spin out, it's just really related to what do you do to really run this business really well. Whether we're inside Aramark or outside of Aramark, ***we should be really, really expert at logistics because we're running a route-based business***. And going back to your question of kind of what surprised you, I mean, candidly, I love our team and I think we're doing amazing work, ***but I was surprised that we weren't doing more sophisticated things around routing and scheduling and logistics.***

103. Similarly, at a May 31, 2023 conference, Zillmer represented that AUS had caught up with its competitors, stating that "if you look at our sales volumes, our net new business wins and our [customer] retention[,] we're right there with our competitors." Zillmer further touted AUS's performance and customer contract renewals, and attributed its comparatively weaker reported performance to a one-time "fuel recovery fee," rather than underlying deficiencies in the business.

104. At a June 8, 2023 conference, Defendant Scott stressed the importance of customer retention as a fundamental element of Vestis's future success and represented that AUS had "outstanding customer relationships." Scott further attributed the Company's customer retention and growth prospects to "the investments [Aramark] already made in [the Company's] infrastructure." Scott also touted the "portfolio of logistics initiatives" already in place, noting that she "c[a]me from a route-based business previously so I'm familiar with these tools," and that she personally had "spent time in the field riding along with [employees] and meeting our customers."

According to Scott, it was "very clear over the last 18 months that with a new strategic plan, which we have now put in place and with the establishment of some new functional capabilities, we can take this business to a new level."

***The Company Prepares for the Spinoff by Filing a Registration Statement and an Information Statement***

105. On August 15, 2023, Vestis filed a Form 10 registration statement (as amended, the "Registration Statement") with the SEC, which became effective on September 8, 2023, and included a preliminary information statement (the "Information Statement") that was executed on September 11, 2023. The Information Statement furthered the previous statements about the growth of the Company, boasting about the Company's "[l]ong tenured [c]ustomer relationships" and "recurring revenue streams", which were made possible "due to the quality of [Vestis'] services and products" and its "ability to deliver on-time."

106. The Information Statement also stated that the Company had a customer retention rate "in excess of 90%," which provided Vestis with a "significant competitive advantage[]" and was a "key competitive strength[]." Maintaining a customer retention rate above 90% was vital to the Company, since any rate below 90% would indicate that Vestis had serious issues with customer retention. Vestis's top competitor, Cintas, typically maintained a customer retention rate above 95%, and, according to former employees, Vestis internally considered any retention rate below 90% to be "DEFCON One." The Information Statement further stated that its strong "customer retention" would deliver "high quality revenue growth" for the Company.

107. The Information Statement also purported that the Company had successfully implemented critically important management technology called "Telematics." Telematics is essential to route-based companies by combining GPS technology and telecommunications which allows users of Telematics to plan more efficient routes by the use of real-time data, delivery

schedules, and delivery statuses. The Information Statement further touted the implementation of Telematics: "We seek to increase route efficiency with technology and processes that reduce travel time, distance and fuel consumption. For example, our new telematics technology allows us to proactively reduce fuel usage by limiting idling through real-time, in-cab driver alerts."

108. On September 13, 2023, Vestis executives held an inaugural "Vestis Analyst Day" call. During the analyst day call, Defendant Scott, Vestis's incoming CEO, represented that she had "joined Aramark Uniform Services a couple of years ago with the intent of preparing the business for this exact moment." Defendant Scott continued to tout the investments Aramark made stating that "the investments that Aramark already quite wisely made in this business, the ramping of the sales force, the investment of our operating system platform"- investments that were "in place," "in our run rate" and had "been made."

109. During the investor presentation on Vestis Analyst Day, the Company stated that "the single highest value growth lever is retention, which we achieve through ***service excellence***." The presentation further emphasized Vestis's "sticky" customer base and longstanding relationships with national accounts, which had an average tenure of approximately 26 years and were expected to continue to propel the Company's growth.

110. Defendant Scott also highlighted the quality of Vestis's services stating that Vestis is "doing exactly what we say we're going to do, deliver on the promise, show up on time every week, deliver the products and services that you … promise to your customers and do that with consistency and excellence."

111. Defendant Scott continued to emphasize the investments Vestis had made in its technology systems to ensure accurate, on-time deliveries for customers. Specifically, Defendant Scott touted the "implementation of [the] ABS system," which had been "launched across our

entire network," and gave team members the "digital tools in their hands so they can interact more seamlessly and more efficiently with the customer."

112. Defendant Scott further characterized Vestis as a growth business, stating that "we're going to grow our top line revenue CAGR on an organic basis, 5% to 7%," and "deliver 18% to 20% adjusted EBITDA margin" by fiscal year 2028. Even though Vestis's uniform business reported flat revenue year-over-year, Defendant Scott stated that the flatness was "very intentional" and was purportedly due to "nonregrettable losses around some accounts that just didn't make sense for our portfolio."

113. Also, during the analyst day call, Defendant Dillon, Vestis's incoming CFO, represented that the Company would operate with an "annual capital investment [that] will be about 3% of revenue."

114. Defendant Scott further explained the Company's carefully constructed plan to generate growth, stating the following, in relevant part:

> We have been extremely prudent about the way that we built this plan, and we've been very measured about modest investments, leveraging the investments that Aramark already quite wisely made in this business, the ramping of the sales force, the investment of our operating system platform, those investments are in place. They've been made, they're in our run rate and we're going to take great advantage of those.

115. Regarding growth, Defendant Dillon stated that Vestis's 5% to 7% growth would arise from (i) "2% to 3% from high quality new growth," (ii) "2% to 3% from retaining our existing customers," and (iii) "about a percent of pricing on average." Regarding price and inflation worries, Defendant Dillon stated, "[W]e've also demonstrated our ability to take price and pass-through inflation as one of the ways to deal with an inflationary environment."

116. Also during the Analyst Day conference, Defendants Scott and Dillon emphasized the investments in Vestis's sales team. For instance, Defendant Dillon stated, "most importantly,

the sales force numbers stay with us because we think we're at the right team level." Defendant Scott similarly stated that sales team members "have reached their stride" and are "now hitting the productivity levels that we desire for them." Defendant Scott added that "[W]e're managing performance very effectively and we're making sure that we get the right revenue per head."

117. On October 2, 2023, Vestis's common stock began trading on the NYSE under the symbol "VSTS." The Company is now "a leading provider of uniform rentals and workplace supplies across the United States and Canada" to more than 300,000 locations. Vestis's clients span several industries, including manufacturing, hospitality, retail, pharmaceuticals, and healthcare.

118. As detailed herein, throughout the Relevant Period, Defendants Scott and Dillon continued to make materially false and/or misleading statements concerning Vestis's customer retention, service quality, operational capabilities, growth, and ability to increase prices, while the Director Defendants allowed the aforementioned statements to be made and signed the 2023 Form 10-K repeating material representations concerning Vestis's customer retention, service capabilities, and use of Telematics. In particular, the challenged statements failed to disclose that: (1) Vestis had suffered significant known customer losses before the Spinoff, including the loss of large national accounts, and its customer retention rate had fallen to approximately 85.8% during the fourth quarter of fiscal year 2023; (2) Vestis suffered from longstanding service and delivery deficiencies, including failures to make complete, accurate, and on-time deliveries, which were causing customer losses and undermining the Company's purported "service excellence"; (3) although Telematics had been installed or deployed across much of Vestis's fleet, the Company was not effectively using the technology and its data in its day-to-day operations to ensure accurate and on-time deliveries; (4) the weakness in Vestis's uniforms business was not merely the result

of strategic or "nonregrettable" customer exits or business closures, but was materially affected by known pre-Spinoff customer losses and service-driven attrition; and (5) Vestis's service deficiencies were causing pricing sensitivity, requiring the Company to moderate planned price increases and contributing to pricing and volume erosion. In light of the foregoing, the challenged statements concerning Vestis's customer retention, service-delivery capabilities, growth, pricing, and underlying financial health were materially false and misleading and/or omitted material facts necessary to make those statements not misleading.

***The Company's Former Employees Reveal That Vestis Lost Significant Customers Before the Spinoff Due to Poor Service***

119. Despite the challenged public statements concerning the Company's customer retention and service quality, the accounts provided by former employees in the Securities Class Action show that AUS faced significant customer-retention issues before the Spinoff.

120. For example, FE1 stated that before the Spinoff in 2023, he saw internal documents revealing Aramark was experiencing customer retention issues, stating that "[customer] losses there during my time consulting certainly outweighed the gains." FE1 stated he could "see the bleeding of the customers and the type of customers and businesses that were being lost versus the businesses that the sales teams were signing up." FE1 also stated that, prior to the Spinoff, he saw that, due to the Company's "repetitive failures," a "giant" and long-term customer, Pape Material Handling, left for a competitor, Cintas.

121. Customer departures were largely damaging to the Company, with FE1 stating that if retention rates fell below 90%, it was considered a "DEFCON One" situation. Notably, according to internal Vestis reports obtained by the plaintiffs in the Securities Class Action, in the five weeks before the Spinoff, the Company lost $55 million in recurring revenue, almost 8% of

the first quarter 2024 revenue of $718 million. Even worse, between late August and September 2023, the Company was losing more than $9 million in recurring revenue per week, on average.

122. FE3 reported that two large national accounts, Tyson's Chicken and Whole Foods, left Vestis due to its poor service. FE3 stated that AUS "had a lot of knowledge that there were a lot of service issues that were not being corrected [for Tyson's Chicken] at least since 2022." FE3 also stated that "[a]nytime you lose a customer in the uniform business it usually boils down to one of two things: you either lose it because someone else undercut your price or you have so many service issues that cannot be overcome."

123. FE4 also reported that several of his customers who entered into three-to-five year contracts would leave shortly thereafter, stating that "[s]ervice was so bad that these clients left within the first 30 to 90 days. I promised these customers all of this stuff and they immediately left." FE4 noted that the reason behind customers leaving so quickly was due to lower quality and "trash" products. Notably, FE4 stated that after the Spinoff, the product quality got even worse because the Company would deliver dirty, worn, and ripped floor mats, stating that "[i]t was very clear to us and the clients that Vestis stopped investing in new products."

124. FE5 also stated that the Company's assertion of medium-sized businesses closing was the reason for the Company's customer loss was not true. FE5 further stated that during his four years at Vestis, he never once had a medium-sized customer go out of business and his customers only left because of the Company's poor service.

***Former Employees Reveal That Chronic Underinvestment in AUS's Facilities Contributed to Service and Quality Issues***

125. The former employees also described chronic underinvestment in AUS's facilities that impaired the quality of its products and services, notwithstanding the public representations that the investments necessary to improve the business had already been made.

126. Aramark entered the uniform services industry by acquiring a series of large plants to clean uniforms. However, many of the plants were old, some of which were built in the 1980's, and as FE1 described, Aramark had "a lot of big plants that were running a lot of product through them and were badly in need of upgrade or replacement." FE1 further stated that "[i]f you have old plants, and you are not willing to invest in them then you have a disaster on your hands." FE1 added "there was a failure to invest in their facilities which are now a detriment to providing quality service."

127. The facilities in Portland, Oregon and Memphis, Tennessee were so poor that FE1 stated that it felt like "any day, the city or some government entity would come in and just put a red tag on the building and say, 'You can't operate that here anymore.'"

128. FE1 stated that he believed the February 2024 resignation of the Company's Chief Operating Officer ("COO"), Chris Synek ("Synek"), was related to the condition of Vestis's facilities and the resources available to improve them. FE1 believed Synek felt "misled" as to "commitments to quality, commitments to resources, commitments to capital," and recalled hearing that Synek had raised issues concerning "housekeeping" and "facility maintenance" after visiting Vestis plants.

129. FE3 similarly described a disagreement between Synek and Defendant Scott concerning efforts to improve the Company's facilities, stating that Synek was "trying to make changes, and they were not being received."

130. FE5 stated that Aramark did nothing to improve Vestis' operations or infrastructure, and that after the Spinoff, Vestis continued to have quality issues.

131. FE10 stated that the Company's failure to invest in its facilities caused the facilities to "lag substantially behind on processing capabilities and new state-of-the-art equipment," caused

uniforms to "look terrible," and were ultimately delivered to customers "wrinkled," shrunk to the wrong sizes, and otherwise "fade out really quickly." Notably, FE10 stated that when working with older machines, "[y]ou know the quality is not going to be good. It's going to take longer to clean. The machine is going to break down often."

132. FE4 reported similar issues with the plant where he worked. He stated that Vestis "rode that equipment until the very last bit of it worked" and that the facility was at least 20 years outdated. FE4 further added that the issues at his plant caused the quality issues customers complained about before choosing to leave Vestis.

***Former Employees Reveal that Vestis' Service Functions Were So Bad Its Service Was "Nonexistent"***

133. In addition to the quality issues, FE10 also reported that Aramark struggled with its services, "whether it be product shortages or product quality or not having a good customer management program." FE10 further elaborated stating that customers getting incorrect items was one of the "biggest pain points" for customers, and he pointed out that no matter how cheap Vestis's prices are, customers will "leave when you[r] service is bad."

134. FE12 revealed that customer items would routinely get lost after they were picked up for servicing. FE12 further stated that despite Vestis utilizing barcodes to track products, the quality of the barcodes used was so poor due to the low quality of the uniforms that they were unreadable.

135. FE10 also identified issues with barcodes, stating that there "was no scanning going on" and as a result customers would be frustrated with the Company's lack of inventory management. The lack of scanning was further corroborated by FE1, who stated that the Company did not force any of its employees to actually scan the barcodes, and that in many plants it was viewed as optional.

136. Customers were also increasingly unhappy with the Company's low-quality offerings which would quickly break down and become unusable. In addition, these issues didn't change following the Spinoff, with FE1 stating that Aramark's grading system used to evaluate product quality actually worsened after the Spinoff. FE1 stated that the Company either changed its product grading standards or was trying to extend the life of its products to improve short term profits.

137. FE12 also reported quality issues with the Company's products, stating that he had lost several customers to Cintas because of the quality issues. FE12 also noted that in one instance, an account he had just signed received their first shipment of rags, which were delivered with holes in them. FE12 also stated "it was very embarrassing to deliver such poor-quality products" and cited it as a reason of why he left the Company. FE12 still receives text messages from customers complaining about the quality of the products.

138. FE16 further described losing customers due to quality issues with the products and services. FE16 stated that the Company had constantly misplaced aprons and towels or returned items with holes in them and still dirty. Uniforms in particular caused issues for FE16, where FE16's customers would routinely not receive the same number of uniforms back that were sent to be serviced.

139. FE16 reported issues with delivery times for some products. For new customers who ordered uniforms, FE16 stated that even though the timeline for initial delivery was four to six weeks, customers routinely had to wait for more than five months before they received the uniforms.

***Former Employees Reveal They Were Told to Ignore Customer Complaints***

140. Former employees not only reported about the Company's poor service but also its poor customer relationships. FE4 stated that he was instructed not to take customer calls and was specifically told by "management" to "gloss" over customer complaints and to even block some customers from calling. FE4 further elaborated stating his "job was to go out there, sign them up, promise them everything and then don't talk to them anymore."

141. FE8 reported issues with the Company's billing procedures. FE8 stated that he saw "fees that had been tacked on to the client's bill" when comparing the differences between what the Company and customer agreed to and the actual bill received by the customer. When FE8 brought this issue to his supervisor, he was instructed to direct customers to a 1-800 number, which FE8 described as a "run around" for clients.

142. FE12 reported that customers consistently complained about incorrect invoices and that they were being overcharged. FE5 corroborated this when he stated that account executives were trained to "not explain the contract with the customers" unless asked.

143. FE5 reported that the long-term contracts that the Company and client would enter into allowed Vestis to ignore complaints from customers. For example, FE5 recalled a conversation with another employee who was laughing at the amount of complaints from Cracker Barrel, a large national account for Vestis, because Cracker Barrel still had two years left on the contract and that Cracker barrel was "stuck with them."

**False and Misleading Statements**

***Registration Statement and Information Statement***

144. Prior to the start of the Relevant Period, in preparation for the Spinoff, on August 15, 2023, the Company filed the Registration Statement on Form 10 with the SEC. The

Registration Statement was declared effective by the SEC on September 8, 2023. Included within the Registration Statement was a preliminary Information Statement.

145. On or around September 11, 2023, the Information Statement was filed with the SEC as an attachment to a Form 8-K, which was signed by Defendant Scott and Aramark CEO Zillmer.

146. The Information Statement highlighted Vestis's "competitive advantage" in regards to customer retention rates, with the Company holding a "customer retention rate [] in excess of 90%," noting that the Company had a "significant competitive advantage[]" as the result of its "long-tenured customer relationships." The Information Statement further highlighted the Company's ability to "maintain long-term relationships with our customers due to the quality of our services and products" and the Company's "ability to deliver on-time."

147. Under the heading, "High-Quality Revenue Growth," the Information Statement states that the Company "serve[s] an attractive, large and long-tenured customer base" which the Company remains "focused on retaining these customers … by ensuring we are delivering … new or updated services and products."

148. Regarding the Company's "new [T]elematics technology," which is meant to increase route efficiency," the Information Statement states that "[w]e seek to increase route efficiency with technology and processes that reduce travel time, distance and fuel consumption. For example, our new [T]elematics technology allows us to proactively reduce fuel usage by limiting idling through real-time, in-cab driver alerts."

149. In discussing the Company's risk factors, under the subheading for "Operational Risks," the Information Statement states, in relevant part:

> Vestis' failure to retain its current customers, renew its existing customer contracts on comparable terms and obtain new customer contracts could adversely affect Vestis' business, financial condition or results of operations.
>
> * * *
>
> The failure to renew a significant number of Vestis' existing contracts, including on the same or more favorable terms, would have a material adverse effect on Vestis' business, financial condition or results of operations, and the failure to obtain new business could have an adverse impact on Vestis' growth and financial results.

***September 13, 2023 Analyst/Investor Day***

150. A few days following the filing of the Information Statement, Vestis held its inaugural Analyst/Investor Day, at which Defendants Scott and Dillon presented on behalf of the Company.

151. In the Investor Day presentation, a slide was shown which stated that the Company's "single highest value growth lever is retention, which we achieve through service excellence," highlighting the Company's "[s]ticky [c]ustomer [b]ase" consisting of "[h]igh tenure[d]" customers, including a "national account tenure of ~26 years."

152. During her remarks on the Investor Day conference call, Defendant Scott highlighted how the Company's large national accounts contributed to its retention rate, stating that "our national account customers are with us for 26 years. So these are very loyal customers, we have very strong relationships, and we are seen as great partners." Defendant Scott added that "our team is very focused on doing exactly what we say we're going to do, deliver on the promise, show up on time every week, deliver the products and services that you promise to your customers and do that with consistency and excellence."

153. The Investor Day presentation also highlighted the Company's "implementation of ABS," stated that it had already "launched across [Vestis'] entire network," and that the system had "allowed us to [] put a handheld in the hand of every route service representative who's in a

customer location … so we've given them digital tools in their hands so that they can interact more seamlessly and more efficiently with the customer." Defendant Scott noted that the Company had now "digitize[ed] the experience" for its drivers, sales team, and customer, with the customers supposedly providing "incredibly positive feedback," given that the "data analytics" has allowed the Company's employees to "really trend customer behaviors and understand what's happening with that customer so that we can provide excellent service to them."

154. In response to an analyst's question regarding "what you talked about a little bit in terms of purposeful growth and sometimes stepping back a little bit because if you go through the financials you see like the workplace supplies had very good growth, but the uniforms were kind of—were basically flat revenue year-over-year. Can you talk about the dynamics that were behind that and why we didn't see Uniforms growth?" Defendant Scott stated that the losses were "very intentional," and as a result "non-regrettable," noting that "And then you have, quite frankly, non-regrettable losses around some accounts that just didn't make sense for our portfolio. So you've got a couple of accounts that have left the portfolio as well that are depressing that uniforms number … So while you may see that as a depressed number or a flat number, it's very intentional."

***November 29, 2023 Earnings Conference Call***

155. On November 29, 2023, before market opening, the Company issued a press release that reported the Company's financial performance for the fourth quarter of 2023. Later that same day, the Company held an earnings conference call to discuss the financial results.

156. One analyst asked a question regarding the Company's flat revenue, asking "As you execute your strategy that you outlined at the Analyst Day [] should we expect to see the uniforms business maybe accelerate a bit versus what we saw in fiscal 2023? Clearly, we're making really nice progress on the workplace supplies, but in uniforms [growth is] lighter."

Defendant Scott responded that the flatness was "very purposeful," stating "[w]e are just purposely at times exiting some business … So I would expect you should see a muted uniforms growth rate again in FY '24, but that is a very purposeful decision to grow very strategically under high-quality verticals and exiting some underperforming businesses."

157. Later during the earnings conference call, in replying to an analyst's request for comment "on recent trends in add/stop, net new, and of client retention," Defendant Scott replied by highlighting the Company's "amazing customer experience," "above 90%" "retention rates," and the "service excellence culture across the [C]ompany," further noting that "We are seeing really, really great feedback from our customers around these initiatives. And so we feel very, very good about the establishment of a service excellence culture across the company. We also continue to deliver retention rates that are above 90% as we stated in our Form 10." Defendant Scott further stressed that the Company's national accounts, "as you know, stay more than 20 years with us. So they're very valuable customers and the lifetime value is great."

158. These statements were false and misleading because: (i) the Company did not establish "service excellence" because the Company was unable to provide on-time, accurate, and quality service; (ii) the Company was in fact losing large national accounts during this period, including a loss of two large national accounts in the months leading up to the spinoff; and (iii) the Company's customer retention rate had fallen to 85.8% during the fourth quarter of fiscal 2023.

***December 21, 2023 Form 10-K***

159. On December 21, 2023, Vestis filed its 2023 Form 10-K Report with the SEC, which was signed by Defendants Scott, Dillon, Holloman, Pertz, Burke, Jokinen, McKee, Whitney, and Williams and attached certifications pursuant to Rules 13a-14(a) and 15d-14(a)

under the Exchange Act and the Sarbanes-Oxley Act of 2002 (“SOX”) signed by Defendants Scott and Dillon attesting to the accuracy of the 2023 Form 10-K.

160. Regarding the Company’s customer retention rates, the 2023 Form 10-K reiterated the same statements from the Information Statement. *Supra* ¶146.

161. Regarding the Company’s Telematics technology, the 2023 Form 10-K reiterated the same statements from the Information Statement. *Supra* ¶148.

162. Regarding the Company’s operational risk factors, the 2023 Form 10-K reiterated the same statements from the Information Statement. *Supra* ¶149.

163. These statements were false and misleading because (i) the Company was not delivering its services on time, which was causing it to lose long-standing customer relationships; (ii) although Telematics technology had been installed or deployed across much of the Company’s fleet, the Company was not effectively utilizing the technology and its data to ensure accurate and on-time deliveries; and (iii) the “operational risk” described by the Company had already materialized because of Vestis’s operational deficiencies and its inability to deliver its products and services on time.

## Signs of Trouble Emerge as the False and Misleading Statements Continue

***February 6, 2024 Synek Resignation***

164. The first sign of trouble emerged on February 6, 2024, after trading hours, when Company COO Synek announced his resignation for “personal reasons,” effective immediately. Synek was appointed COO on September 11, 2023, and had only been with the Company five months.

165. As alleged above, former employees later suggested that Synek’s departure was related to the condition of Vestis’s facilities and the resources available to improve them.

***February 7, 2024 Press Release and Earnings Call***

166. Additional signs of trouble emerged the following day. On February 7, 2024, before market opening, the Company issued a press release (the "Q1 2024 Press Release") reporting its financial performance for the first quarter of fiscal 2024. The Q1 2024 Press Release reported revenue growth of only 2.5%, below the Company's full-year revenue-growth guidance of 4.0% to 4.5%. Despite this underperformance, the Q1 2024 Press Release "reaffirm[ed] Fiscal 2024 guidance" and stated that the Company continued to "expect to deliver revenue growth in the range of 4.0 to 4.5%" for the year.

167. Later that same day, the Company held an earnings conference call (the "Q1 2024 Earnings Call") to discuss the financial results. During the Q1 2024 Earnings Call, Defendant Scott stated that she had personally "monitor[ed] [customer departures] very closely" and had undertaken extensive efforts to "go[] pretty deep and granular to understand what are those patterns and trends around why customers leave." Defendant Scott then stated that according to her analysis, the revenue miss was due to a "trend" of "small and medium enterprise customers with an uptick in business closures."

168. Despite Defendant Scott's previous comments about the loss of some customers as "purposeful" and "very intentional," Defendant Scott revealed that Vestis had suffered an "unfortunate loss" of a "national account" prior to the Spinoff. Defendant Scott stated that an "unfortunate loss from [Vestis'] Clean Room business" had occurred "last year" and the loss was so significant that it had "continue[d] to flow through" the Company's revenue streams in 2024. Defendant Scott acknowledged that the Company "hadn't talked about [the loss] a lot because it wasn't a strategic loss" and that it was "regrettable":

> And then we also have a national account loss, but we haven't talked about it a lot because it wasn't a strategic loss. It was an unfortunate loss from our Clean Room

> business last year, and it was a loss that continues to flow through in the first 2 quarters of this year, which also affects that Uniforms number. And again, we haven't talked about it a lot because it's a regrettable loss, It wasn't part of our strategy ….

169. On this news, Vestis' stock price fell $2.88 per share, or approximately 12.9% from a price of $22.30 per share on February 6, 2024, to a close at $19.42 per share on February 7, 2024. However, Scott and Dillon continued to make reassuring statements concerning the Company's growth prospects, customer retention, pricing, and operational capabilities.

170. For example, the Q1 2024 Press Release quoted Defendant Scott as stating that the Company's "high-quality growth strategy is effective" and "I remain confident in our ability to deliver on our full year financial outlook."

171. During the Q1 2024 Earnings Call, Defendant Scott noted that "[a]s we move through the balance of the year, we expect acceleration in our growth rates." Defendant Scott also made certain to note that "[w]e are also seeing opportunity for additional pricing actions in the back half of the year. As a result, I remain confident in our ability to deliver our full year guidance of 4% to 4.5% revenue growth and adjusted EBITDA margin of 14.3%."

172. Defendant Scott explained during the Q1 2024 Earnings Call that the Company would "take price," stating that "[s]o we do see the opportunity to take some incremental pricing in the back half of the year. We've been very thoughtful and I would say, somewhat moderated about pricing." Defendant Scott further stated that the Company would be taking price "in a very surgical way with a lot of analysis around which customers will be impacted and what the current relationship and state and condition of the relationship is with that customer." Defendant Scott also stated that "we're also seeing really good progress with our frontline account executives, driving revenue per head."

173. An analyst asked whether the Company would achieve its guidance for 2024, stating "Now it sounds like you do have some opportunistic areas to take price, which I think you explained, is very clear and exciting. So does this more so give us – when we think about it as driving incremental comfort in achieving the guidance for the year?" Defendant Scott replied, "Yes. I would think about [pricing] as additional comfort to give you confidence, the same confidence we have that we're going to ramp up the growth rates in the back half of the year, and deliver against the 4% to 4.5% … yes, you should think about pricing as a -- providing a level of comfort." Defendant Dillon also noted that "[t]he surgical pricing was in our guidance … we talked at Analyst Day [about] the disciplined pricing … that there were opportunities for surgical pricing. And so we're really just capitalizing on that."

174. In discussing the Company's use of Telematics, Defendant Scott stated that "[y]ear-to-date, we've successfully deployed new [T]elematics technology across 89% of our fleet and fully deploy[ed] new routing and scheduling technology and processes across North America, all a part of our strategy to establish the capability to continuously optimize our network and our routes." Defendant Scott added that Telematics would "ensure that we're running routes in compliance with how we'd like to do that."

175. One analyst asked a question regarding client retention, stating "I was hoping that you could please comment on retention, the trends and the drivers, whether it's service quality, the predictive analytics, the digital tools. And conversely, what reasons for attrition would be outside of the delivery exits, say specifically within Uniform direct sales?" Defendant Scott responded by highlighting the Company's retention as "greater than 90%, which is what we filed in the Form 10 and we continue to maintain retention above that," adding that "we have no real surprises as it

relates to retention and where we expected to be for the most part." Defendant Scott continued, stating, in relevant part:

> [G]enerally speaking, when you look at the rest of retention and you look at recent codes to answer your question around why would you see customers leave. We are seeing small to medium enterprise customers with an uptick in business closures, we are monitoring that very closely. And so just important to note as we look at recent codes. And it's also when you try to drill it down a little bit further. You can see a trend … So when you look at what is happening around business closures, particularly with small to medium enterprise customers, we're going pretty deep and granular to understand what are those patterns and trends around why customers leave. We're seeing a slight uptick in customers going out of business in those all those medium and enterprise verticals ….

176. One analyst asked Defendant Scott to "discuss some of the factors you're seeing that may be causing Uniforms business growth to come a bit below some of what your competitors are seeing where growth is tracking somewhere north of 5%." In response, Defendant Scott stated "I did mention that we do see an uptick in business closures as it relates to our SMEs [small and medium-sized enterprises]. So that also has an effect on the number as it relates to the impact of retention on the Uniforms number, and we're very transparent about that, we're very aware of it, we're managing that very closely."

177. These statements were false and misleading because: (i) Vestis's service deficiencies impaired the Company's ability to "take price," requiring it to moderate planned price increases and contributing to pricing and volume erosion; (ii) customer losses were not merely "intentional" or "very purposeful," but included known, regrettable customer losses and losses caused by the poor quality of the Company's services; (iii) although Telematics technology had been installed or deployed across much of the Company's fleet, Vestis was not effectively utilizing the technology and its data to ensure accurate and on-time deliveries; (iv) the Company had no basis to tout customer retention above 90% without disclosing the significant customer losses it was experiencing and that its customer retention rate had fallen to approximately 85.8% during the

fourth quarter of fiscal 2023; and (v) customer attrition and the weakness in Vestis's uniforms growth were not principally the result of an uptick in business closures, but were materially attributable to service-related customer losses.

**The Truth Emerges**

***May 2, 2024 Press Release***

178. On May 2, 2024, the truth fully emerged when Vestis issued a press release reporting the Company's financial performance for the second quarter of fiscal 2024. The press release revealed another quarter of weak revenue performance, with revenue of just $705 million, constituting only a 0.9% increase from the same fiscal quarter a year earlier and falling below analysts' consensus of $718 million, as well as an Adjusted EBITDA margin of only 12.4%.

179. Additionally, the press release revealed a "Revised Fiscal Year 2024 Outlook," with Vestis "now expect[ed] to deliver fiscal 2024 revenue growth in the range of [negative] (1)% to 0%," as opposed to the previously expected revenue growth of 4 to 4.5%.

***May 2, 2024 Earnings Call***

180. On an earnings conference call held that same day, Defendant Scott disclosed that despite the prior claims that Vestis had "fully deploy[ed] new routing and scheduling technology and processes across North America," Vestis did not even "have a process to verify that the truck has been loaded accurately and that all of the product that needs to go to our customer is, in fact, being delivered to our customer." Defendant Scott further stated that "we [were] not tight on our processes as it relates to disciplined loading of trucks, delivering on-time, delivering full loads" and thus Vestis needed to "do a better job on being on time, being complete, being fully loaded and putting metrics around that, so that we can ensure that we're delivering consistently the expectations that our customers have for us."

181. Defendant Scott also acknowledged that, although Telematics had been installed in the Company's trucks, Vestis had not been using the technology to ensure on-time deliveries or routing efficiencies and was only then expecting to begin using its insights and data operationally. Scott described Telematics as a basic, "very normal thing that you would have in a B2B [business-to-business] route-based business," and stated:

> And so as I come into the business and evaluate how we're measuring service efficacy, I found it very odd that we did not have [T]elematics in our fleet. That's a very normal thing that you would have in a B2B route-based business. But we were not using [T]elematics to make sure that we are delivering to customers on time and also that we are following routing efficiencies. So we've put that [T]elematics in our trucks, and we expect very quickly that we'll begin to use those insights and that data from [T]elematics to shore this up and to make sure that we're delivering on time and that we're where we should be, when we should be.

182. Regarding the Company's revenue shortfall in the first quarter, Defendant Scott admitted that the "root causes" of why customers were leaving the Company were due to "service experiences related to our procedures" that were specifically "related to how we are delivering the load on time and incomplete loads." Defendant Scott further stated: "we know that ***more than 70% of the [customer] cancellations are due to causes that are within our control***."

183. The earnings call also revealed that the Company had lost two major national accounts, further admitting that one of the principal reasons for the Company's poor performance was due to a "large amount of rollover losses from FY 2023." Defendant Dillon stated that "[c]ustomer losses reduced second quarter revenues by 9% year-over-year, more than offsetting our new business growth," and no less than two-thirds of that lost revenue, or $40.8 million, was because of the customer losses known before the Spinoff. Defendant Dillon stated that 6% of the 9% of the lost revenue came from "known customer losses as we exited fiscal 2023" and "3% from customer losses during this fiscal year." Defendant Dillon further admitted that the Company was still "currently absorbing [the] losses incurred in FY 23."

184. Further, despite having boasted about a customer retention rate "in excess of 90%," it was revealed on the earnings call that the Company's customer retention rate in the fourth quarter of fiscal 2023 had actually fallen to 85.8%.

185. The earnings call also revealed that, despite prior assertions that the Company would "take price" in the second half of fiscal 2024, Vestis's service deficiencies had instead forced the Company to moderate planned price increases in an effort to retain customers. Specifically, Vestis had "deliberately moderated[]" pricing because "service efficacy and price sensitivity go hand-in-hand"—such that Vestis's "service gaps ha[d] driven price sensitivity, as fully satisfied customers typically don't leave because they've received a price increase." Defendant Scott further admitted that "the need to enhance our service … resulted in pricing and volume erosion during the renewal process."

186. Lastly, Defendant Scott revealed that "these challenges have been in our business for quite some time" and were "not related to the spin [] I'll be clear about that." Defendant Scott also stated that the Company was losing customers as a result of "very specific delivery matters related to on time delivery" and "shortages on loads." Defendant Dillon further confirmed management's prior knowledge of the effect of lower retention on the Company's performance, stating that "we knew the impact coming in of the lower retention rate."

187. Reactions from the market analysts on the call were telling. JP Morgan analyst Andrew Steinerman stated that "your plan had been just a couple of months ago for a targeted area price increase, and then you pivoted to a price decrease." Stephanie Moore, an analyst from Jefferies, referenced the Company's executives' "change in tone [] in the last 90 days," and the Company's "reversal in pricing capabilities." After the truth emerged during the call, JP Morgan downgraded the Company's stock, citing "company specific challenges." Barclays assessed "the

need for further investment is more apparent than ever." Likewise, Baird analysts reported on the "structural issues [that] will take time to fix," and questioned management's credibility, noting "credibility is low."

188. On this news, the price per share of Vestis stock fell $8.31, or 45%, from closing at a price of $18.47 per share on May 1, 2024, to close at a price of $10.16 per share on May 2, 2024.

**THE INDIVIDUAL DEFENDANTS' KNOWLEDGE**

189. Throughout the Relevant Period, Defendants Scott and Dillon were aware of the Company's longstanding service and customer-retention problems. [redacted]

190. For example, as alleged in the Securities Class Action, FE1 stated that Defendant Scott was "absolutely" aware of the service issues that were driving customers away, explaining that the "reports were very clear" and that there were "not a lot of ways to hide quality and service" problems at the Company.

191. FE3 similarly reported that Defendant Scott personally met with Tyson Chicken's leadership in an effort to retain the account, demonstrating that Scott was aware of the service issues affecting one of the Company's major national accounts and the risk that the customer would leave.

192. [redacted]

193. [redacted]

194. [redacted]

195. [redacted]

[redacted]

196. [redacted]

197. [redacted]

198. [redacted]

199. [redacted]

200. [redacted]

201. [redacted]

202. [redacted]

203. [redacted]

204. [redacted]

[redacted]

205. [redacted]

206. [redacted]

207. [redacted]

**THE SECURITIES CLASS ACTION**

208. As a result of the misconduct alleged herein, Vestis, Defendants Scott and Dillon, Aramark, and Aramark CEO Zillmer were named as defendants in the Securities Class Action.

The Securities Class Action asserts claims under Sections 10(b) and 20(a) of the Exchange Act arising from materially false and misleading statements concerning, among other things, Vestis's customer retention, service and delivery capabilities, customer losses, revenue growth, pricing, and financial condition.

209. On September 30, 2025, the Court issued the Securities MTD Order, denying the defendants' motions to dismiss in all respects except as to the Section 10(b) claim against Zillmer. *Plumbers*, 808 F. Supp. 3d at 1391. In evaluating the securities claims, the Court applied what it described as a "triple-layered pleadings standard," requiring the securities plaintiffs to satisfy not only the plausibility requirements of Federal Rule of Civil Procedure 8, but also Rule 9(b)'s particularity requirement and the heightened pleading requirements imposed by the Private Securities Litigation Reform Act ("PSLRA"). *Id.* at 1380. With respect to scienter under the PSLRA, the plaintiffs were further required to plead particularized facts giving rise to a "strong inference" that each defendant acted with an intent to defraud or severe recklessness. *Id.*

210. Applying those heightened standards, the Court held that the securities plaintiffs had sufficiently alleged actionable misstatements concerning the principal subjects at issue here. The Court rejected defendants' efforts to analyze the challenged statements in isolation, explaining that their arguments "invite the Court to miss the forest for the trees." *Id.* at 1383. The Court instead found sufficiently alleged that defendants made optimistic statements concerning Vestis's prospects while omitting past-performance information necessary for reasonable investors to evaluate "Vestis's customer-retention prowess, its service-delivery capabilities, and its underlying financial health." *Id.*

211. With respect to customer retention, the Court noted that defendants had made retention the "centerpiece" of Vestis's growth strategy, represented that the Company continued

to achieve retention above 90%, and touted Vestis's "sticky" customer base and the approximately 26-year average tenure of its national accounts. *Id.* at 1383-84. Yet the securities plaintiffs alleged that Vestis was simultaneously "bleeding" customers; that internal reports showed the Company losing an average of approximately $9 million in recurring revenue each week during the five weeks before the Spinoff and approximately $4.2 million per week from August 2023 through April 2024; that Vestis had lost large national accounts before the Spinoff; and that its retention rate had fallen to 85.8% during the fourth quarter of fiscal 2023. *Id.* at 1384.

212. The Court reached the same conclusion concerning defendants' representations regarding Vestis's purported "service excellence" and operational capabilities. Defendants had touted Vestis's ability to deliver quality products and services on time through investments in logistics technologies, including ABS and Telematics. *Id.* at 1384. The securities plaintiffs, however, alleged longstanding operational failures, including delayed and incomplete deliveries, mismatched and lost inventory, and the absence of a process to verify that delivery trucks were loaded accurately and customers received all required products. *Id.* at 1384-85. The Court further noted allegations that, notwithstanding Scott's representation that Telematics had been successfully deployed across most of Vestis's fleet, Vestis still lacked the capability to effectively leverage the technology's data and insights in its day-to-day operations. *Id.*

213. The Securities MTD Order also sustained allegations that defendants misled investors concerning the financial health of Vestis's recurring-revenue uniforms business. Defendants had attributed weak growth to intentional and strategic decisions to exit less-profitable business and later to an increase in business closures, while continuing to reaffirm Vestis's growth expectations and ability to increase prices. *Id.* at 1385-86. Vestis later admitted, however, that at least two large national accounts lost before the Spinoff created a material revenue-growth

headwind during fiscal 2024, that more than $40 million in known pre-Spinoff customer losses continued to depress growth, and that approximately 70% of customer losses were attributable not to business closures or other outside factors but "to causes that are within our control"—namely, Vestis's own service failures. *Id.* at 1386. Scott further admitted that those service failures were creating "price sensitivity" and resulting price and volume "erosion." *Id.*

214. Based on those allegations, the Court held that defendants' representations could mislead a reasonable investor into believing that Vestis was profiting from its recurring-revenue business by providing excellent service to loyal customers "when in truth and in fact" Vestis was doing the opposite. *Id.* at 1386. The Court likewise rejected arguments that certain challenged statements were non-actionable merely because they were technically true, holding that allegations concerning Vestis's annual retention rate, the tenure of its national accounts, and the installation of Telematics adequately alleged actionable half-truths because the statements omitted critical qualifying information concerning Vestis's actual performance. *Id.* at 1387. The Court further held that the challenged representations concerned matters too central to Vestis's business—customer service and retention—and were made at too pivotal a time surrounding the Spinoff to be dismissed as immaterial. *Id.* at 1388.

215. The Court separately evaluated scienter under the PSLRA's demanding "strong inference" standard. *Id.* at 1388-90. The Court identified two of Vestis's own admissions as "particularly incriminating." *Id.* at 1388. First, Scott and Dillon later acknowledged that Vestis continued to suffer significant financial headwinds in 2024 from "known," pre-Spinoff customer losses, including the regrettable loss of a large national account. *Id.* at 1388-89. The Court found that admission supported a strong inference that those losses were already known when investors were told that depressed uniforms growth resulted from "very intentional" and "nonregrettable"

losses. *Id.* Second, Vestis later disclosed that its retention rate had fallen to 85.8% during the fourth quarter of fiscal 2023, supporting a strong inference that Scott knew that figure when she told investors in November 2023, in response to a question concerning recent retention trends, that Vestis continued to achieve retention rates above 90%. *Id.* at 1389.

216. The Court further found that the totality of the allegations supported a strong inference that Scott and Dillon knew they were presenting investors with a rosy picture of Vestis's business that was inconsistent with its actual performance. *Id.* at 1389-90. Among other things, the Court relied upon the timing of their statements during a critical period surrounding the Spinoff; Scott's and Dillon's roles in preparing Vestis to operate independently; the central importance of customer service and retention to Vestis's profitability and growth; the longstanding and substantial nature of the service failures; internal reports reflecting serious retention issues and customer losses; and allegations that Scott personally intervened in an effort to retain a large national account. *Id.*

217. Considering these allegations together, the Court held that the securities plaintiffs had adequately pleaded a strong inference of scienter as to Scott and Dillon. The Court concluded that, although it was possible Scott and Dillon had acted in good faith, that inference was no more likely than the inference that they "knew how fundamental service failures were costing Vestis millions of dollars in recurring revenue every week, but hid the truth from investors until plummeting revenues forced them to come clean." *Id.* at 1390. Accordingly, the Court denied the motion to dismiss on scienter grounds as to Scott and Dillon and, by extension, Vestis and Aramark. *Id.*

## DAMAGES TO VESTIS

218. As a direct and proximate result of the Individual Defendants' conduct, Vestis has incurred and will continue to incur substantial costs and expenses.

219. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

220. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

221. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

222. As a direct and proximate result of the Individual Defendants' conduct, Vestis has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the misrepresentations alleged herein.

## DERIVATIVE ALLEGATIONS

223. Plaintiff brings this action derivatively and for the benefit of Vestis to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Vestis, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

224. Vestis is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

225. Plaintiff is, and has been at all relevant times, a shareholder of Vestis. Plaintiff will adequately and fairly represent the interests of Vestis in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

226. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

227. A pre-suit demand on the Board of Vestis is futile and, therefore, excused. At the time of filing Plaintiff's original complaint, the Board consisted of the following nine individuals: Defendants Holloman, Burke, Jokinen, McKee, Pertz, Whitney, and Williams (the "Director Defendants"), and non-parties Keith Meister ("Meister") and Bill Goetz ("Goetz") (together with the Director Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors that were on the Board at the time of the filing of the original complaint.[4]

228. Demand is excused as to each of the seven Director Defendants because each faces a substantial likelihood of liability for the misconduct alleged herein. [redacted]

[4] The Company's Board at the time of this amended filing comprises ten members: each of the seven Director Defendants, Meister, Goetz, and non-party James J. Barber, Jr. ("Barber"). Thus, even if demand were to be considered as to the current Board, it would be excused as futile because seven of ten members are Defendants in this action and face a substantial likelihood of liability on the claims herein or otherwise cannot consider a demand with requisite independence or disinterestedness.

[redacted]

229. Under Delaware law, when directors communicate with stockholders, they must do so honestly and in accordance with their fiduciary duties, and directors who knowingly disseminate materially false or misleading information may be held liable for breach of fiduciary duty. [redacted]

230. [redacted]

231. [redacted]

[redacted]

232. [redacted]

233. [redacted]

234. [redacted]

[redacted]

235. [redacted]

236. [redacted]

[redacted]

237. [redacted]

238. [redacted]

[redacted]

239. [redacted]

240. [redacted]

241. [redacted]

242. Thus, each of the seven Director Defendants faces a substantial likelihood of liability for the wrongdoing alleged herein. Because Plaintiff need only establish demand futility as to five of the nine Directors serving on the Board when the original complaint was filed, a majority of that Board could not impartially consider a demand and demand is excused.

243. Accordingly, Plaintiff was not required to make a pre-suit demand on the Board before commencing this action.

## FIRST CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

244. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

245. Each of the Individual Defendants owed fiduciary duties to Vestis, including duties of loyalty and good faith and the obligation to act honestly and in the best interests of the Company when managing its affairs and communicating information concerning the Company's business, operations, and financial condition.

246. Defendants Scott and Dillon breached their fiduciary duties by knowingly making, causing, and/or permitting the Company to make materially false and misleading statements and omissions concerning, among other things, Vestis's customer retention, service and delivery capabilities, customer losses, growth prospects, pricing capabilities, and use of Telematics technology, despite their knowledge of materially adverse information concerning those subjects.

247. [redacted]

248. In sum, the Individual Defendants caused and/or permitted Vestis to make materially false and misleading statements and omissions that failed to disclose that: (i) Vestis had suffered significant known customer losses, including the loss of major national accounts; (ii) longstanding service and delivery deficiencies were causing customers to leave the Company; (iii) Vestis's customer retention rate had fallen materially below the levels publicly represented by the Company; (iv) although Telematics technology had been installed or deployed across much of Vestis's fleet, the Company was not effectively utilizing that technology and its data to ensure accurate and on-time deliveries; (v) Vestis's service deficiencies were impairing the Company's ability to increase pricing and were contributing to pricing and volume erosion; and (vi) weakness

in the Company's growth was materially attributable to lost business and service-related customer attrition rather than merely strategic customer exits or business closures.

249. The Individual Defendants further breached their fiduciary duties by failing to correct materially false and misleading statements concerning these matters and by continuing to cause and/or permit Vestis to disseminate materially misleading information after becoming aware of facts contradicting the Company's public representations.

250. The Individual Defendants' conduct alleged herein was knowing and/or undertaken in bad faith and was not a good-faith exercise of business judgment intended to advance Vestis's corporate interests.

251. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, Vestis has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

252. Plaintiff, on behalf of Vestis, has no adequate remedy at law.

## SECOND CLAIM
## Against Individual Defendants for Unjust Enrichment

253. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

254. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Vestis.

255. The Individual Defendants received compensation and other benefits from Vestis during the period in which they engaged in the wrongful conduct alleged herein, including salaries, bonuses, stock-based compensation, director compensation, and other benefits, the retention of which would be unjust in light of their breaches of fiduciary duty and other misconduct.

256. Plaintiff, as a shareholder and representative of Vestis, seeks restitution from the Individual Defendants and an order disgorging all benefits and compensation obtained by the Individual Defendants as a result of, or during the course of, their wrongful conduct, to the extent equity and justice require.

257. Plaintiff, on behalf of Vestis, has no adequate remedy at law.

**THIRD CLAIM**
**Against Individual Defendants for Abuse of Control**

258. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

259. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Vestis, for which they are legally responsible.

260. As a direct and proximate result of the Individual Defendants' abuse of control, Vestis has sustained and continues to sustain significant damages, and the Individual Defendants are liable to the Company.

261. Plaintiff, on behalf of Vestis, has no adequate remedy at law.

**FOURTH CLAIM**
**Against Individual Defendants for Gross Mismanagement**

262. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

263. By their actions alleged herein, the Individual Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Vestis in a manner consistent with the operations of a publicly held corporation.

264. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Vestis has sustained and will continue to sustain significant damages.

265. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

266. Plaintiff, on behalf of Vestis, has no adequate remedy at law.

**FIFTH CLAIM**
**Against Individual Defendants for Waste of Corporate Assets**

267. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

268. During the period in which they engaged in the misconduct alleged herein, the Individual Defendants caused the Company to pay them salaries, fees, and other compensation and benefits that were unwarranted in light of their misconduct.

269. As a result of the foregoing, and by failing to properly consider the interests of the Company and its shareholders, the Individual Defendants caused Vestis to waste valuable corporate assets, including by causing the Company to incur substantial legal fees, costs, liabilities, and other expenses arising from the misconduct alleged herein.

270. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

271. Plaintiff, on behalf of Vestis, has no adequate remedy at law.

**SIXTH CLAIM**
**Against Defendants Scott and Dillon for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

272. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

273. Vestis and Defendants Scott and Dillon are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Scott's and Dillon's willful and/or reckless violations of their obligations as officers and/or directors of Vestis.

274. Defendants Scott and Dillon, because of their positions of control and authority as officers and/or directors of Vestis, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Vestis, including the wrongful acts complained of herein and in the Securities Class Action.

275. Accordingly, Defendants Scott and Dillon are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

276. As such, Vestis is entitled to receive all appropriate contribution and, to the extent available under applicable law, indemnification from Defendants Scott and Dillon.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Vestis, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached their fiduciary duties to Vestis;

(c) Determining and awarding to Vestis the damages sustained by it as a result

of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Vestis and the Individual Defendants to take all necessary actions to reform and improve Vestis's corporate governance and internal procedures to comply with applicable laws and to protect Vestis and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Vestis to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Vestis restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: September 1, 2026

Respectfully submitted,

**WEBB, KLASE & LEMOND, LLC**

*/s/ G. Franklin Lemond, Jr.*
G. Franklin Lemond, Jr.
franklin@webbllc.com
E. Adam Webb
Adam@webbllc.com
1900 The Exchange, S.E., Suite 480
Atlanta, GA 30339
Tel.: (770) 444-9594

-and-

**THE BROWN LAW FIRM, P.C.**
Timothy Brown (Admitted *PHV*)
Saadia Hashmi (PHV forthcoming)
Nicolas Kravitz (PHV forthcoming)
Sarah Maneval
tbrown@thebrownlawfirm.net
shashmi@thebrownlawfirm.net
nkravitz@thebrownlawfirm.net
smaneval@thebrownlawfirm.net
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Tel.: (516) 922-5427

*Attorneys for Plaintiff Michael Gribe*

**VERIFICATION**

I, Michael Gribe, am a plaintiff in the within action. I have reviewed the allegations made in this Amended Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of August, 2026.

DocuSigned by:



5FB460828B5D439...

Michael Gribe